## BUCHANAN *v.* WARLEY.

### ERROR TO THE COURT OF APPEALS OF THE STATE OF KENTUCKY.

No. 33.   Argued April 10, 11, 1916; restored to docket for reargument April 17, 1916; reargued April 27, 1917.—Decided November 5, 1917.

A city ordinance which forbids colored persons to occupy houses in blocks where the greater number of houses are occupied by white persons, in practical effect prevents the sale of lots in such blocks to colored persons, and is unconstitutional.   A white owner, who has made an otherwise valid and enforceable contract to convey such a lot to a colored person, for the erection of a house upon it for occupancy by the vendee, is deprived, in violation of the Fourteenth Amendment, of an essential element of his property,—the right to dispose of it to a constitutionally qualified purchaser,—and may attack the prohibition under the Fourteenth Amendment in a suit for specific performance of the contract against the vendee.

A city ordinance forbidding colored persons from occupying houses as residences, or places of abode or public assembly, on blocks where the majority of the houses are occupied by white persons for those purposes, and in like manner forbidding white persons when the conditions as to occupancy are reversed, and which bases the interdiction upon color and nothing more, passes the legitimate bounds of police power and invades the civil right to acquire, enjoy and use

property, which is guaranteed in equal measure to all citizens, white or colored, by the Fourteenth Amendment.

Such a prohibition can not be sustained upon the grounds that, through race segregation, it serves to diminish miscegenation and promotes the public peace by averting race hostility and conflict, or that it prevents deterioration in value of property owned and occupied by white people; nor does the fact that upon its face it applies impartially to both races relieve it from the vice of discrimination or obviate the objection that it deprives of property without due process of law. *Plessy* v. *Ferguson,* 163 U. S. 537, and *Berea College Case,* 211 U. S. 45, distinguished.

165 Kentucky, 559, reversed.

THE case is stated in the opinion.

·*Mr. Clayton B. Blakey* and *Mr. Moorfield Storey,* with whom *Mr. Harold S. Davis* was on the briefs, for plaintiff in error:

The plaintiff's rights are directly involved and the court has jurisdiction. *Truax* v. *Raich,* 239 U. S. 33, 39. He does not complain of discrimination against the colored race or seek to enforce their rights, but seeks to enforce a contract—a property right—on the ground that the ordinance violates rights secured by the Fourteenth Amendment and therefore is no bar to performance of the contract.

It is manifest that the effect of the ordinance is to cause continual controversy as to whether particular houses may be occupied by white or colored persons; it does not prevent the two races from living in close propinquity, and in many cases this condition is perpetuated rather than eliminated; conditions existing at the time of its passage are not disturbed. It deprives an owner of the right to live upon his own land, or to sell or lease it to any person who may wish to buy or hire, thereby causing depreciation in value. It is apparent therefore that it does not accomplish its declared purpose, "to prevent conflict and ill-feeling between the white and colored

races" and "to preserve the public peace." There is nothing in the conduct of the negro which is the foundation of the ordinance, but simply the prejudice of race and color. Its predominant purpose was to place the negro, however industrious, thrifty and well-educated, in as inferior a position as possible with respect to his right of residence, and to violate the spirit of the Fourteenth Amendment without transgressing the letter.

The general presumption is that a law is enacted in good faith for the purpose declared, but where, as in this case, it is obvious that the real purpose was very different, the courts will determine the purpose from the natural and legal effect of the language employed when put into operation. *Bailey* v. *Alabama*, 219 U. S. 219; *Lochner* v. *New York*, 198 U. S. 45, 64; *Guinn* v. *United States*, 238 U. S. 347, 364; *Austin* v. *Murray*, 16 Pick. 121.

The constitutional guaranty of equal protection, without discrimination on account of color, race, religion, etc., includes "the right to acquire and possess property of every kind," *Corfield* v. *Coryell*, 4 Wash. C. C. 371, 381; *Slaughter House Cases*, 16 Wall. 36, 76; to dispose of it and to live upon one's own land. The ordinance under review prevents the plaintiff from selling his property for the only use to which it can be put. If he cannot sell to a colored person, he cannot sell at all, for the lot is so situated with reference to other colored men's residences that no white man would buy it. It thus destroys, without due process of law, fundamental rights attached by the law to ownership of property; it destroys without compensation rights which had become vested before it took effect. It differs only in degree from the ordinances held void in *State* v. *Gurry*, 121 Maryland, 534; *State* v. *Darnell*, 166 N. Car. 300; and *Carey* v. *Atlanta*, 143 Georgia, 192.

The ordinance also abridges the privileges and immunities guaranteed by the Fourteenth Amendment, and deprives those affected of the equal protection of the laws.

*Slaughter House Cases,* 16 Wall. 36, 70–72; *Ex parte Virginia,* 100 U. S. 339, 344; *Strauder* v. *West Virginia,* 100 U. S. 303, 306; *Washington, Alexandria & Georgetown R. R. Co.* v. *Brown,* 17 Wall. 445; *State* v. *Darnell,* 166 N. Car. 300, 302, 303. It forbids, under penalty of criminal proceedings, an owner of land in many parts of the city to live thereon if he happens to be a negro, although he would be free to do so if he were white. This inequality is not removed by forbidding white owners to live on their own land in other parts of the city, for the Constitution cannot be satisfied by any such offsetting of inequalities. A plainer case of racial discrimination cannot well be imagined.

The cases upholding laws providing for separate railroad accommodations are inapplicable here, for if equal facilities be furnished and the rates are reasonable and nondiscriminatory the carrier may determine what vehicle the passenger shall occupy. *Chiles* v. *Chesapeake & Ohio Ry. Co.,* 218 U. S. 71; *West Chester & Philadelphia R. R. Co.* v. *Miles,* 55 Pa. St. 209; *The Sue,* 22 Fed. Rep. 843. No right otherwise existing is impaired and hence such statutes are not within the prohibitions of the Fourteenth Amendment. See *McCabe* v. *Atchison, Topeka & Santa Fe Ry. Co.,* 235 U. S. 151.

The cases of public schools are even more remote from that under consideration. The States are not bound to provide schools for anybody. Statutes regulating attendance at schools do not cut down rights previously recognized, but grant privileges which would not otherwise exist. If, therefore, the privileges granted to white and to colored children are in general similar, there can be no complaint. It is true that a statute requiring segregation in *private* schools was sustained in the *Berea College Case,* 211 U. S. 45, but there the statute was construed as an amendment to the defendant's charter. If defendant had been an individual, it is plain that the statute must have been declared void. See dissenting opinion, p. 68.

The cases upholding statutes against miscegenation are also irrelevant, since marriage is a matter of status in which the interests of the State are vitally concerned. Such statutes are equal in their operation since they impose no penalty upon the members of one race for doing that which is lawful for members of the other race. *Pace* v. *Alabama*, 106 U. S. 583.

The ordinance cannot be justified as an exercise of the police power. Like any other law police regulations are subject to the equal protection clause of the Fourteenth Amendment, *Atchison, Topeka & Santa Fe Ry. Co.* v. *Vosburg*, 238 U. S. 56, 69; *Geiger-Jones Co.* v. *Turner*, 230 Fed. Rep. 233, 244, 245; and a regulation which forbids citizens of one color to do acts which those of another color are permitted to do does not afford equal protection of the laws. *Truax* v. *Raich*, 239 U. S. 33, 41; *Yick Wo* v. *Hopkins*, 118 U. S. 356, 369; *Barbier* v. *Connolly*, 113 U. S. 27, 31; *Opinion of the Justices*, 207 Massachusetts, 601, 605; *Ah Kow* v. *Nunan*, 5 Sawy. 552. The ordinance cannot be justified as a measure to protect property rights, since it is designed to protect the rights only of a certain class; or as a measure to prevent conflict between the races, since the means adopted are beyond the constitutional power of the State to employ. If such legislation can be sustained, there is no limit to possible discrimination between citizens. An attempt to segregate Irish from Jews, foreign from native citizens, Catholics from Protestants, would be fully as justifiable in communities where there is feeling between them.

*Mr. Stuart Chevalier* and *Mr. Pendleton Beckley* for defendant in error:

The ordinance is fair and equal on its face and effects no discrimination for or against either race. It is a valid police regulation, enacted in good faith, and clearly and fairly designed to accomplish its declared purpose. It

does not interfere with the ownership but merely regulates the occupancy of property. The right of an owner to occupy his own property, previously acquired, is expressly secured by § 4, so that every constitutional objection that it is an undue interference with property rights is removed.

The court will not declare invalid a police regulation unless it clearly appears from the law itself, or from facts of which the court may take judicial notice, that it violates constitutional guaranties; whether the legislation is wise, expedient or necessary, or the best calculated to promote its object, is a legislative and not a judicial question. *Chicago, Burlington & Quincy Ry. Co.* v. *McGuire,* 219 U. S. 568, 569; *McLean* v. *Arkansas,* 211 U. S. 547, 548; *Noble State Bank* v. *Haskell,* 219 U. S. 575, 580; *Munn* v. *Illinois,* 94 U. S. 113; *Powell* v. *Pennsylvania,* 127 U. S. 678; *Tenement House Department* v. *Moeschen,* 179 N. Y. 325; 203 U. S. 583; *Hyman* v. *Boldrick,* 153 Kentucky, 77, 79; *Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342, 357, 366; *Tanner* v. *Little,* 240 U. S. 369; 385; *Cusack Co.* v. *Chicago,* 242 U. S. 526, 530.

Legislation segregating the white and colored races has universally been recognized by the courts as a constitutional exercise of the police power. Thus regulations requiring separate railroad accommodations, laws establishing separate schools, and laws against miscegenation have been sustained. *Plessy* v. *Ferguson,* 163 U. S. 537, 545; *Chiles* v. *Chesapeake & Ohio Ry. Co.,* 218 U. S. 71; *West Chester & Philadelphia R. R. Co.* v. *Miles,* 55 Pa. St. 209; *Roberts* v. *City of Boston,* 5 Cush. 198; *People* v. *Gallagher,* 93 N. Y. 438; *Berea College Case,* 123 Kentucky, 209; 211 U. S. 45. The same reasons, constitutional and practical, which justify the segregation of the races in these instances apply with redoubled force here. Unlike the ordinance declared invalid in *Yick Wo* v. *Hopkins,* 118 U. S. 356, this ordinance operates equally upon both

classes, and does not vest the municipal authorities with the arbitrary power in its enforcement to discriminate against any particular class.

The Constitution does not prohibit a State from abridging under its police power privileges and immunities of citizens of the State; the fact that privileges thereby regulated may not in fact be equal or identical does not amount to a denial of equal protection of the laws; nor does the Constitution guarantee social or economic equality. The "privileges and immunities of citizens of the United States" are in nowise affected or abridged by legislation of this character. *Slaughter House Cases*, 16 Wall. 36; *Maxwell* v. *Dow*, 176 U. S. 581; *Twining* v. *New Jersey*, 211 U. S. 96; *Hadacheck* v. *Los Angeles*, 239 U. S. 394; *Guinn* v. *United States*, 238 U. S. 347; *Myers* v. *Anderson*, 238 U. S. 368; *Ex parte Kinney*, 3 Hughes, 9; *Cummings* v. *County Board of Education*, 175 U. S. 528; *People* v. *Gallagher*, 93 N. Y. 438; *Barbier* v. *Connolly*, 113 U. S. 27; *Soon Hing* v. *Crowley*, 113 U. S. 703. Every police regulation necessarily restrains, limits or destroys certain personal or property rights, or both. This does not make the law unequal in the legal sense, as the inequalities arise from matters with which the law has no concern, such as geographical location, economic or educational condition, etc. The investigation of these matters is for the legislative, not the judicial, determination. *Hadacheck* v. *Los Angeles*, 239 U. S. 394, 413. If neither race is denied any privilege in the cases of schools, coaches, or marriage, there is no denial of an advantage or privilege here. The objection that the ordinance limits the negroes to the "undesirable" sections of the city, therefore, does not go to the validity of the ordinance. But in fact, it neither restricts the negroes to the places where they are now living nor to the undesirable sections. There is nothing in the law to prevent the indefinite expansion of the present negro neighborhoods or the building up of new

negro sections. The improvement of the negro's condition is limited only by his own character and efforts.

The use of property and the liberty of contract are subject to reasonable police regulations, and their enforcement does not deprive a person of property without due process of law. *Slaughter House Cases, supra; Northwestern Fertilizing Co.* v. *Hyde Park,* 97 U. S. 659; *Mugler* v. *Kansas,* 123 U. S. 623; *Tenement House Department* v. *Moeschen,* 179 N. Y. 325; 203 U. S. 583; *O'Bryan* v. *Highland Apartment Co.,* 128 Kentucky, 282; *Welch* v. *Swasey,* 214 U. S. 91. But the present ordinance, far from impairing such rights, will have the effect of protecting property from the most serious and destructive-results.

The objection that segregation laws impair property values and prevent individuals from living where they please is fully answered by this court in *L'Hote* v. *New Orleans,* 177 U. S. 587. The injury is merely incidental to the city's right to segregate and does not warrant the overthrow of police regulations.

Police regulations prohibiting the carrying on in defined areas of certain industries, lawful in themselves, having for their object the protection, enjoyment and stability of the home, have frequently been sustained, even though discriminating in favor of persons engaged in the same industry in other parts of the city. *Hadacheck* v. *Los Angeles,* 239 U. S. 394; *Reinman* v. *Little Rock,* 237 U. S. 171; *Fischer* v. *St. Louis,* 194 U. S. 361; *Schefe* v. *St. Louis,* 194 U. S. 373; *Ex parte Quong Wo,* 118 Pac. Rep. 714; *Ex parte Montgomery,* 125 Pac. Rep. 107; *People* v. *Ericsson,* 105 N. E. Rep. 315. So with respect to regulations prohibiting the erection of tall buildings, *Welch* v. *Swasey,* 214 U. S. 91; and the erection in residential sections of billboards. *Cusack Co.* v. *Chicago,* 108 N. E. Rep. 340.

The fact that the ordinance interferes with the *jus disponendi* or restricts the right of the individual to contract with reference to his property is no valid objection.

These rights are subject to the police power, provided its exercise is not so arbitrary as to deny due process. *Crowley* v. *Christensen*, 137 U. S. 86; *Berea College Case*, 211 U. S. 45; *Schmidinger* v. *Chicago*, 226 U. S. 578; *Northern Pacific Ry. Co.* v. *Duluth*, 208 U. S. 583.

The ordinance is not discriminatory because it is prospective only or because it is not as drastic as it might be made. *Welch* v. *Swasey*, 214 U. S. 91; *L'Hote* v. *New Orleans*, 177 U. S. 587; *Rideout* v. *Knox*, 148 Massachusetts, 368.

A sufficient answer to the contention that if this law is upheld there is no limit to the extremes to which such legislation might ultimately extend, e. g., separation of natives from aliens, Catholics from Protestants, etc., is found in the majority opinion in *Plessy* v. *Ferguson*, 163 U. S. 550.

The right to enact laws providing for reasonable residential segregation, similar to that under consideration, has been sanctioned by the courts of other States. *Hopkins* v. *City of Richmond*, 117 Virginia, 692. In *State* v. *Gurry*, 121 Maryland, 534, and *Carey* v. *Atlanta*, 143 Georgia, 192, the right was recognized; and the reason for not upholding the ordinances involved was that they did not protect vested rights. The ordinance in the *Carey Case* also contained the absurd provision that a person of one color occupying a house in a mixed block could object to one of another color moving next door to him. In *State* v. *Darnell*, 166 N. Car. 300, the ordinance was also held open to the objection that it impaired vested rights, but that case turned principally upon the extent of the charter powers of the town of Winston, N. C., the court expressly refraining from passing upon the power of the State to authorize the ordinance.

*Mr. S. S. Field*, by leave of court, filed a brief on behalf of the Mayor and City Council of Baltimore as *amicus curiœ*.

*Mr. W. Ashbie Hawkins,* by leave of court, filed a brief on behalf of the Baltimore Branch of the National Association for the Advancement of Colored People as *amicus curiæ.*

*Mr. Frederick W. Lehmann* and *Mr. Wells H. Blodgett,* by leave of court, filed a brief as *amici curiæ.*

*Mr. Alfred E. Cohen,* by leave of court, filed a brief as *amicus curiæ*

*Mr. Chilton Atkinson,* by leave of court, filed a brief on behalf of the United Welfare Association of St. Louis as *amicus curiæ.*

*Mr. H. R. Pollard,* by leave of court, filed a brief on behalf of the City of Richmond, Virginia, as *amicus curiæ.*

*Mr. Wells H. Blodgett, Mr. Charles Nagel, Mr. James A. Seddon, Mr. Selden P. Spencer, Mr. Sidney F. Andrews, Mr. W. L. Sturdevant, Mr. Percy Werner, Mr. Everett W. Pattison* and *Mr. Joseph Wheless,* by leave of court, filed a brief as *amici curiæ.*

MR. JUSTICE DAY delivered the opinion of the court.

Buchanan, plaintiff in error, brought an action in the Chancery Branch of Jefferson Circuit Court of Kentucky for the specific performance of a contract for the sale of certain real estate situated in the City of Louisville at the corner of 37th Street and Pflanz Avenue. The offer in writing to purchase the property contained a proviso:

"It is understood that I am purchasing the above property for the purpose of having erected thereon a house which I propose to make my residence, and it is a distinct

part of this agreement that I shall not be required to accept a deed to the above property or to pay for said property unless I have the right under the laws of the State of Kentucky and the City of Louisville to occupy said property as a residence." This offer was accepted by the plaintiff.

To the action for specific performance the defendant by way of answer set up the condition above set forth, that he is a colored person, and that on the block of which the lot in controversy is a part there are ten residences, eight of which at the time of the making of the contract were occupied by white people, and only two (those nearest the lot in question) were occupied by colored people, and that under and by virtue of the ordinance of the City of Louisville, approved May 11, 1914, he would not be allowed to occupy the lot as a place of residence.

In reply to this answer the plaintiff set up, among other things, that the ordinance was in conflict with the Fourteenth Amendment to the Constitution of the United States, and hence no defense to the action for specific performance of the contract.

In the court of original jurisdiction in Kentucky, and in the Court of Appeals of that State, the case was made to turn upon the constitutional validity of the ordinance. The Court of Appeals of Kentucky, 165 Kentucky, 559, held the ordinance valid and of itself a complete defense to the action.

The title of the ordinance is: " An ordinance to prevent conflict and ill-feeling between the white and colored races in the City of Louisville, and to preserve the public peace and promote the general welfare by making reasonable provisions requiring, as far as practicable, the use of separate blocks for residences, places of abode and places of assembly by white and colored people respectively." ·

By the first section of the ordinance it is made unlawful for any colored person to move into and occupy as a

residence, place of abode, or to establish and maintain as a place of public assembly any house upon any block upon which a greater number of houses are occupied as residences, places of abode, or places of public assembly by white people than are occupied as residences, places of abode, or places of public assembly by colored people.

Section 2 provides that it shall be unlawful for any white person to move into and occupy as a residence, place of abode, or to establish and maintain as a place of public assembly any house upon any block upon which a greater number of houses are occupied as residences, places of abode or places of public assembly by colored people than are occupied as residences, places of abode or places of public assembly by white people.

Section 4 provides that nothing in the ordinance shall affect the location of residences, places of abode or places of assembly made previous to its approval; that nothing contained therein shall be construed so as to prevent the occupancy of residences, places of abode or places of assembly by white or colored servants or employees of occupants of such residences, places of abode or places of public assembly on the block on which they are so employed, and that nothing therein contained shall be construed to prevent any person who, at the date of the passage of the ordinance, shall have acquired or possessed the right to occupy any building as a residence, place of abode or place of assembly from exercising such a right; that nothing contained in the ordinance shall prevent the owner of any building, who when the ordinance became effective, leased, rented, or occupied it as a residence, place of abode or place of public assembly for colored persons, from continuing to rent, lease or occupy such residence, place of abode or place of assembly for such persons, if the owner shall so desire; but if such house should, after the passage of the ordinance, be at any time leased, rented or occupied as a residence, place

of abode or place of assembly for white persons, it shall
not thereafter be used for colored persons, if such occupa-
tion would then be a violation of section one of the ordi-
nance; that nothing contained in the ordinance shall pre-
vent the owner of any building, who when the ordinance
became effective leased, rented or occupied it as a resi-
dence, place of abode, or place of assembly for white
persons from continuing to rent, lease or occupy such
residence, place of abode or place of assembly for such
purpose, if the owner shall so desire, but if such house
should, after the passage of the ordinance, be at any time
leased, rented or occupied as a residence, place of abode
or place of assembly for colored persons, then it shall not
thereafter be used for white persons, if such occupation
would then be a violation of section two thereof.

The ordinance contains other sections and a violation
of its provisions is made an offense.

The assignments of error in this court attack the ordi-
nance upon the ground that it violates the Fourteenth
Amendment of the Constitution of the United States, in
that it abridges the privileges and immunities of citizens
of the United States to acquire and enjoy property, takes
property without due process of law, and denies equal
protection of the laws.

The objection is made that this writ of error should be
dismissed because the alleged denial of constitutional
rights involves only the rights of colored persons, and
the plaintiff in error is a white person. This court has
frequently held that while an unconstitutional act is no
law, attacks upon the validity of laws can only be enter-
tained when made by those whose rights are directly af-
fected by the law or ordinance in question. Only such
persons, it has been settled, can be heard to attack the
constitutionality of the law or ordinance. But this case
does not run counter to that principle.

The property here involved was sold by the plaintiff.

in error, a white man, on the terms stated, to a colored man; the action for specific performance was entertained in the court below, and in both courts the plaintiff's right to have the contract enforced was denied solely because of the effect of the ordinance making it illegal for a colored person to occupy the lot sold. But for the ordinance the state courts would have enforced the contract, and the defendant would have been compelled to pay the purchase price and take a conveyance of the premises. The right of the plaintiff in error to sell his property was directly involved and necessarily impaired because it was held in effect that he could not sell the lot to a person of color who was willing and ready to acquire the property, and had obligated himself to take it. This case does not come within the class wherein this court has held that where one seeks to avoid the enforcement of a law or ordinance he must present a grievance of his own, and not rest the attack upon the alleged violation of another's rights. In this case the property rights of the plaintiff in error are directly and necessarily involved. See *Truax* v. *Raich,* 239 U. S. 33, 38.

We pass then to a consideration of the case upon its merits. This ordinance prevents the occupancy of a lot in the City of Louisville by a person of color in a block where the greater number of residences are occupied by white persons; where such a majority exists colored persons are excluded. This interdiction is based wholly upon color; simply that and nothing more. In effect, premises situated as are those in question in the so-called white block are effectively debarred from sale to persons of color, because if sold they cannot be occupied by the purchaser nor by him sold to another of the same color.

This drastic measure is sought to be justified under the authority of the State in the exercise of the police power. It is said such legislation tends to promote the public peace by preventing racial conflicts; that it tends to main-

tain racial purity; that it prevents the deterioration of property owned and occupied by white people, which deterioration, it is contended, is sure to follow the occupancy of adjacent premises by persons of color.

The authority of the State to pass laws in the exercise of the police power, having for their object the promotion of the public health, safety and welfare is very broad as has been affirmed in numerous and recent decisions of this court. Furthermore, the exercise of this power, embracing nearly all legislation of a local character, is not to be interfered with by the courts where it is within the scope of legislative authority and the means adopted reasonably tend to accomplish a lawful purpose. But it is equally well established that the police power, broad as it is, cannot justify the passage of a law or ordinance which runs counter to the limitations of the Federal Constitution; that principle has been so frequently affirmed in this court that we need not stop to cite the cases.

The Federal Constitution and laws passed within its authority are by the express terms of that instrument made the supreme law of the land. The Fourteenth Amendment protects life, liberty, and property from invasion by the States without due process of law. Property is more than the mere thing which a person owns. It is elementary that it includes the right to acquire, use, and dispose of it. The Constitution protects these essential attributes of property. *Holden* v. *Hardy*, 169 U. S. 366, 391. Property consists of the free use, enjoyment, and disposal of a person's acquisitions without control or diminution save by the law of the land. 1 Blackstone's Commentaries (Cooley's Ed.), 127.

True it is that dominion over property springing from ownership is not absolute and unqualified. The disposition and use of property may be controlled in the exercise of the police power in the interest of the public health, convenience, or welfare. Harmful occupations may be

controlled and regulated. Legitimate business may also be regulated in the interest of the public. Certain uses of property may be confined to portions of the municipality other than the resident district, such as livery stables, brickyards and the like, because of the impairment of the health and comfort of the occupants of neighboring property. Many illustrations might be given from the decisions of this court, and other courts, of this principle, but these cases do not touch the one at bar.

The concrete question here is: May the occupancy, and, necessarily, the purchase and sale of property of which occupancy is an incident, be inhibited by the States, or by one of its municipalities, solely because of the color of the proposed occupant of the premises? That one may dispose of his property, subject only to the control of lawful enactments curtailing that right in the public interest, must be conceded. The question now presented makes it pertinent to enquire into the constitutional right of the white man to sell his property to a colored man, having in view the legal status of the purchaser and occupant.

Following the Civil War certain amendments to the Federal Constitution were adopted, which have become an integral part of that instrument, equally binding upon all the States and fixing certain fundamental rights which all are bound to respect. The Thirteenth Amendment abolished slavery in the United States and in all places subject to their jurisdiction, and gave Congress power to enforce the Amendment by appropriate legislation. The Fourteenth Amendment made all persons born or naturalized in the United States citizens of the United States and of the States in which they reside, and provided that no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, and that no State shall deprive any person of life, liberty, or property without due process

of law, nor deny to any person the equal protection of the laws.

The effect of these Amendments was first dealt with by this court in *The Slaughter House Cases,* 16 Wall. 36. The reasons for the adoption of the Amendments were elaborately considered by a court familiar with the times in which the necessity for the Amendments arose and with the circumstances which impelled their adoption.  In that case Mr. Justice Miller, who spoke for the majority, pointed out that the colored race, having been freed from slavery by the Thirteenth Amendment, was raised to the dignity of citizenship and equality of civil rights by the Fourteenth Amendment, and the States were prohibited from abridging the privileges and immunities of such citizens, or depriving any person of life, liberty, or property without due process of law.  While a principal purpose of the latter Amendment was to protect persons of color, the broad language used was deemed sufficient to protect all persons, white or black, against discriminatory legislation by the States.  This is now the settled law.  In many of the cases since arising the question of color has not been involved and the cases have been decided upon alleged violations of civil or property rights irrespective of the race or color of the complainant.  In *The Slaughter House Cases* it was recognized that the chief inducement to the passage of the Amendment was the desire to extend federal protection to the recently emancipated race from unfriendly and discriminating legislation by the States.

In *Strauder* v. *West Virginia,* 100 U. S. 303, this court held that a colored person charged with an offense was denied due process of law by a statute which prevented colored men from sitting on the jury which tried him. Mr. Justice Strong, speaking for the court, again reviewed the history of the Amendments, and among other things, in speaking of the Fourteenth Amendment, said:

"It [the Fourteenth Amendment] was designed to assure to the colored race the enjoyment of all the civil rights that under the law are enjoyed by white persons, and to give to that race the protection of the general government, in that enjoyment, whenever it should be denied by the States. It not only gave citizenship and the privileges of citizenship to persons of color, but it denied to any State the power to withhold from them the equal protection of the laws, and authorized Congress to enforce its provisions by appropriate legislation. . . . It ordains that no State shall make or enforce any laws which shall abridge the privileges or immunities of citizens of the United States. . . . It ordains that no State shall deprive any person of life, liberty, or property, without due process of law, or deny to any person within its jurisdiction the equal protection of the laws. What is this but declaring that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color? . . .

"The Fourteenth Amendment makes no attempt to enumerate the rights it designed to protect. It speaks in general terms, and those are as comprehensive as possible. Its language is prohibitory; but every prohibition implies the existence of rights and immunities, prominent among which is an immunity from inequality of legal protection, either for life, liberty, or property. Any State action that denies this immunity to a colored man is in conflict with the Constitution."

Again this court in *Ex parte Virginia*, 100 U. S. 339, 347, speaking of the Fourteenth Amendment, said:

"Whoever, by virtue of public position under a State government, deprives another of property, life, or liberty,

without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State."

In giving legislative aid to these constitutional provisions Congress enacted in 1866, c. 31, § 1, 14 Stat. 27, [Rev. Stats., § 1978] that:

"All citizens of the United States shall have the same right in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

And in 1870, by c. 114, § 16, 16 Stat. 144 [Rev. Stats., § 1977] that:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and no other."

In the face of these constitutional and statutory provisions, can a white man be denied, consistently with due process of law, the right to dispose of his property to a purchaser by prohibiting the occupation of it for the sole reason that the purchaser is a person of color intending to occupy the premises as a place of residence?

The statute of 1866, originally passed under sanction of the Thirteenth Amendment, 14 Stat. 27, and practically reënacted after the adoption of the Fourteenth Amendment, 16 Stat. 144, expressly provided that all citizens of the United States in any State shall have the same right to purchase property as is enjoyed by white citizens. Colored persons are citizens of the United States and have the right to purchase property and enjoy and

use the same without laws discriminating against them. solely on account of color. *Hall* v. *DeCuir*, 95 U. S. 485, 508. These enactments did not deal with the social rights of men, but with those fundamental rights in property which it was intended to secure upon the same terms to citizens of every race and color. *Civil Rights Cases*, 109 U. S. 3, 22. The Fourteenth Amendment and these statutes enacted in furtherance of its purpose operate to qualify and entitle a colored man to acquire property without state legislation discriminating against him solely because of color.

The defendant in error insists that *Plessy* v. *Ferguson*, 163 U. S. 537, is controlling in principle in favor of the judgment of the court below. In that case this court held that a provision of a statute of Louisiana requiring railway companies carrying passengers to provide in their coaches equal but separate accommodations for the white and colored races did not run counter to the provisions of the Fourteenth Amendment. It is to be observed that in that case there was no attempt to deprive persons of color of transportation in the coaches of the public carrier, and the express requirements were for equal though separate accommodations for the white and colored races. In *Plessy* v. *Ferguson*, classification of accommodation was permitted upon the basis of equality for both races.

In the *Berea College Case*, 211 U. S. 45, a state statute was sustained in the courts of Kentucky, which, while permitting the education of white persons and negroes in different localities by the same incorporated institution, prohibited their attendance at the same place, and in this court the judgment of the Court of Appeals of Kentucky was affirmed solely upon the reserved authority of the legislature of Kentucky to alter, amend, or repeal charters of its own corporations, and the question here involved was neither discussed nor decided.

In *Carey* v. *City of Atlanta*, 143 Georgia, 192, the Su-

preme Court of Georgia, holding an ordinance, similar
in principle to the one herein involved, to be invalid,
dealt with *Plessy* v. *Ferguson*, and *The Berea College
Case*, in language so apposite that we quote a portion
of it:

"In each instance the complaining person was afforded
the opportunity to ride, or to attend institutions of learn-
ing, or afforded the thing of whatever nature to which
in the particular case he was entitled. The most that was
done was to require him as a member of a class to conform
with reasonable rules in regard to the separation of the
races. In none of them was he denied the right to use,
control, or dispose of his property, as in this case. Prop-
erty of a person, whether as a member of a class or as an
individual, cannot be taken without due process of law.
In the recent case of *McCabe* v. *Atchison &c. Ry. Co.,*
235 U. S. 151, where the court had under consideration
a statute which allowed railroad companies to furnish
dining-cars for white people and to refuse to furnish
dining-cars altogether for colored persons, this language
was used in reference to the contentions of the attorney-
general: 'This argument with respect to volume of traffic
seems to us to be without merit. It makes the constitu-
tional right depend upon the number of persons who may
be discriminated against, whereas the essence of the con-
stitutional right is that it is a personal one.' . . .

"The effect of the ordinance under consideration was
not merely to regulate a business or the like, but was to
destroy the right of the individual to acquire, enjoy, and
dispose of his property. Being of this character, it was
void as being opposed to the due-process clause of the
constitution."

That there exists a serious and difficult problem arising
from a feeling of race hostility which the law is powerless
to control, and to which it must give a measure of con-
sideration, may be freely admitted. But its solution

60.                    Opinion of the Court.

cannot be promoted by depriving citizens of their constitutional rights and privileges.

As we have seen, this court has held laws valid which separated the races on the basis of equal accommodations in public conveyances, and courts of high authority have held enactments lawful which provide for separation in the public schools of white and colored pupils where equal privileges are given. But in view of the rights secured by the Fourteenth Amendment to the Federal Constitution such legislation must have its limitations, and cannot be sustained where the exercise of authority exceeds the restraints of the Constitution. We think these limitations are exceeded in laws and ordinances of the character now before us.

It is the purpose of such enactments, and, it is frankly avowed it will be their ultimate effect, to require by law, at least in residential districts, the compulsory separation of the races on account of color. Such action is said to be essential to the maintenance of the purity of the races, although it is to be noted in the ordinance under consideration that the employment of colored servants in white families is permitted, and nearby residences of colored persons not coming within the blocks, as defined in the ordinance, are not prohibited.

The case presented does not deal with an attempt to prohibit the amalgamation of the races. The right which the ordinance annulled was the civil right of a white man to dispose of his property if he saw fit to do so to a person of color and of a colored person to make such disposition to a white person.

It is urged that this proposed segregation will promote the public peace by preventing race conflicts. Desirable as this is, and important as is the preservation of the public peace, this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the Federal Constitution.

It is said that such acquisitions by colored persons depreciate property owned in the neighborhood by white persons.  But property may be acquired by undesirable white neighbors or put to disagreeable though lawful uses with like results.

We think this attempt to prevent the alienation of the property in question to a person of color was not a legitimate exercise of the police power of the State, and is in direct violation of the fundamental law enacted in the Fourteenth Amendment of the Constitution preventing state interference with property rights except by due process of law.  That being the case the ordinance cannot stand.  *Booth* v. *Illinois,* 184 U. S. 425, 429; *Otis* v. *Parker,* 187 U. S. 606, 609.

Reaching this conclusion it follows that the judgment of the Kentucky Court of Appeals must be reversed, and the cause remanded to that court for further proceedings not inconsistent with this opinion.

*Reversed.*