**I. H. "Sporty" HARVEY, Appellant,**

**v.**

**M. B. MORGAN, Commissioner of Labor Statistics, Appellee.**

No. 10248.

Court of Civil Appeals of Texas.

Austin.

Oct. 27, 1954.

Rehearing Denied Nov. 17, 1954.

Grace & Maverick, San Antonio, Carlos Cadena, San Antonio, Charles J. Lieck, Jr., Albert A. Pena, Jr., Harry M. Bellinger, San Antonio, for appellant.

John Ben Shepperd, Atty. Gen., Horace Wimberly, Edmund L. Cogburn, Asst. Attys. Gen., for appellee.

HUGHES, Justice.

■ ■ Professional boxing is a lawful but strictly regulated activity in Texas. Art. 614–11(f), Texas Penal Code. One of the restrictions is that no one shall "knowingly permit any fistic combat match boxing, sparring or wrestling contest or exhibition between any person of the Caucasian or 'White' race and one of the African or 'Negro' race".

Administration of the Act is conferred upon the Commissioner of Labor Statistics who currently is the Honorable M. B. Morgan, appellee herein.

Appellant is I. H. "Sporty" Harvey, a negro, who holds a valid license as a boxing performer.

On July 20, 1953, appellant applied to Commissioner Morgan for permission to have a professional prize fight with a person of "White or Caucasian descent."

The Commissioner refused this request by letter dated July 28, 1953, the only reasons assigned being the statute quoted above and an identical rule promulgated by him under authority of Art. 614.

This suit was filed in the court below on August 13, 1953, appellant seeking a mandatory order requiring appellee to grant permission for appellant to engage in mixed fights and enjoining appellee from enforcing Sec. 11(f) of the statute or the rule. Alternative pleas were filed asking for a declaratory judgment upon the questions presented.

The basis of appellant's suit, as disclosed by his pleadings, is that the statute and rule of the Commissioner prohibiting white-negro fights constitute State action denying him rights guaranteed by the Fourteenth Amendment to the Constitution of the United States [1] as well as civil rights guaranteed by the Federal Civil Rights Act.[2]

---

1. The pertinent portion of such Amendment reading:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

2. U.S.C.A., Title 42, Sec. 1981, which provides:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

Appellee answered by alleging validity of the statute and rule in question as being a proper exercise of the police power of the State and that

"* * * the legislative purpose for such law and rule, particularly that portion complained of by Plaintiff, whereby a professional boxing contest between a negro and a white person is prohibited, was to prevent situations which engendered racial feelings and tended toward racial riots."

Trial was to the court without a jury and resulted in a take nothing judgment for appellant.

Numerous findings of fact were made by the trial court but only the following are considered to be of any importance in determining the issues presented:

"Defendant's refusal to issue a permit for plaintiff to box a white professional boxer in the State of Texas was due solely to the fact that plaintiff is a Negro.

"That professional boxing matches have a tendency to and do provoke disorder, quarrels, and breaches of the peace.

"The professional boxing matches require much more police protection and service than do ordinary trades and occupations.

"That the legislative intent in regulating professional boxing was to protect the public as well as the participants and in prohibiting mixed matches was to keep down disorders and breaches of the peace."

There was no finding that mixed fights would result in race riots or other disturbances of an unusual nature.

The evidence is undisputed that negro and white professional players have engaged in the same baseball, basketball and football contests in Texas and that no disturbance due to such mixed contests ever occurred.

It is also undisputed that amateur negroes and whites have lawfully engaged in mixed sporting events, including boxing, in Texas without racial incidents. Some of those testifying to having witnessed such events without observing any race tensions or incidents were George Harold Scherwitz for 34 years sports editor of the San Antonio Light, Edgar L. Berlin, attorney and member of the Texas House of Representatives from Jefferson County, Dick Peebles, sports editor of the San Antonio Express since 1936, and Stanley Caufield, attorney, Deputy Boxing Commissioner of Texas and member of the Texas House of Representatives from El Paso.

Mr. Louis Quintinalla, active Deputy Boxing Commissioner assigned to the San Antonio District, and appellee's witness testified as follows:

"Q. As a matter of fact, the high feeling at a boxing match has very little to do with the national or racial extraction of the participants, does it? A. That is right.

"Q. It is just something that happens, no matter who is in the ring? A. I would say yes."

Commissioner Morgan testified at some length but we believe the following excerpts from his testimony fairly reflect the tenor of his views:

"* * * I have discussed the case with quite a number of people, and I have drawn from the things that have been said to me that a great majority of the people of Texas believe that it would be the best to keep the law and not—that is, that the law not be repealed. In other words, the people of Texas, from the conversation I have had with folks, are of the opinion that the customs and habits and traditions of the citizens of Texas are satisfied with our present law and think it would be best to keep the law on our books.

"*     *     *     *     *     *

"Q. Mr. Morgan, which people have you talked to in your investigation of

the traditions that would prejudice this preconception of the citizens of Texas? A. Oh, I have talked to many people. I have talked to practically all of our wrestling promoters. I know of no wrestling promoter in Texas that is for this, and, now, the boxing promoters generally are, would like to have mixed matches, but the public, the man on the street, and the man that contacts me at a wrestling show, many people have discussed it with me.

"*   *   *   *   *   *

"Now, these men in the street, is that on Congress Avenue in Austin? A. Usually at boxing shows. I attend the shows in Austin, Dallas and San Antonio.

"Q. And those people told you that—A. And I have had people around the Capitol, many people around the Capitol have talked to me about it.

"Q. That if a negro and a white man engaged in a professional boxing match, there would be a riot? A. There is a possibility, there could be.

"*   *   *   Well, it is my considered opinion that it is to the best interest of boxing and wrestling that we retain our present law, forming that opinion, as I say, by having discussed the matter, and I think the habits and customs and traditions of Texas people are against mixed matches, I think that if the law is repealed or declared unconstitutional that it will actually hurt boxing and wrestling in Texas. I think it will completely kill the Golden Gloves, which is the stepping-stone for professional boxers, *   *   *

"*   *   *   it is my opinion that the people will fall away from—will become disinterested in boxing and wrestling matches to the extent that it will actually hurt the attendance at the boxing and wrestling matches. I think that the present-day—the newspapers are the sponsors of the Golden Gloves— every paper in Texas, almost, sponsors Golden Gloves boxing, and to allow the mixed matches in the Golden Gloves, the pleasant customer who is now paying an admittance to see these contests, they will just gradually stay away from the game. The papers will become disinterested and withdraw their support. So, I think it will actually injure our amateur, and particularly the Golden Gloves event. It has done so in Oklahoma. It has practically killed the Golden Gloves in the State of Oklahoma. I think it will have the same effect in Texas. I don't think the people of Texas are quite ready for us to abandon our present segregation and restriction on boxing and wrestling. *   *   *

"Our very livelihood and the very nature of things, the State of Texas, the people's attitude toward these things is very definite, and there is a lot of folks have an opinion that it is a good thing. A greater number of people thinks otherwise. So there is a division of opinion in the people on matters of these kinds. Always. So, it is a matter, I think, if it was left up to the vote of the people and by and through their representatives in the Legislature, that is the answer to this question, I think, but I don't think that the people of Texas are yet ready for this change. That is my considered opinion."

The record also reflects that William E. Clayton, District Attorney at El Paso testified that he was a member of the House of Representatives in 1933 when the present boxing law was enacted and the legislative intent in prohibiting boxing matches between negroes and whites "was to prevent riots and disturbances which might arise incident to contests of such a nature between members of the two races."

Mr. Alton Ericson, Supervisor for the State Boxing and Wrestling Commission, Austin, testified that in his opinion injecting race feelings into boxing exhibitions would increase tension, saying:

"I have been to the boxing matches in San Antonio, and particularly where

there was a white boy got a decision over a Latin American, and there was a near riot, and, in my opinion, if a colored boxer was boxing a white fighter, there would even be—or even a Latin American, there would be a greater tension. That is strictly my opinion."

Without discussing in detail the boxing profession as it is regulated in Texas we note that fighters are classified according to weight and each division may have a champion and that while there may be negro champions in each division and white champions in each division there are only white champions, no negro champions and there can, of course, be no overall champion. If negroes and whites could fight each other there is evidence to the effect that negroes could match more and better fights and earn more money.

Appellant has numerous assignments of error but the controlling question is whether the statute proscribing white and negro boxing exhibitions violates the Fourteenth Amendment to the Federal Constitution.

Appellant concedes that professional boxing is an activity which is subject to rigid regulation under police powers reserved to the State by the Federal Constitution.

Every State power, however, including the police power, is limited by the inhibitions of the Fourteenth Amendment. Southern Railway Co. v. Commonwealth of Virginia ex rel. Shirley, 290 U.S. 190, 54 S.Ct. 148, 78 L.Ed. 260.

The equal protection clause of the Fourteenth Amendment, invoked here by appellant, does not take from the States the right and power to classify subjects of legislation so long as such classification is reasonable, is based on proper and justifiable distinctions and is not clearly arbitrary. 12 American Jurisprudence, pp. 140–142.

The classification of this statute is based on color, not all colors, just Caucasian "White" and African or "Negro" black. If this classification and discrimination is reasonable and justifiable then the statute is valid; otherwise, it is void.

In Patsone v. Commonwealth of Pennsylvania, 232 U.S. 138, 34 S.Ct. 281, 282, 58 L.Ed. 539, the Court in sustaining the validity of a State statute which forbade any foreign born person to kill wild game or own or possess a shotgun or rifle, said:

"* * * we start with the general consideration that a state may classify with reference to the evil to be prevented, and that if the class discriminated against is or reasonably might be considered to define those from whom the evil mainly is to be feared, it properly may be picked out. A lack of abstract symmetry does not matter. The question is a practical one, dependent upon experience. The demand for symmetry ignores the specific difference that experience is supposed to have shown to mark the class. It is not enough to invalidate the law that others may do the same thing and go unpunished, if, as a matter of fact, it is found that the danger is characteristic of the class named."

There is no factor of State or local experience in this record, either at the time this statute was passed or during the 20 ensuing years, to justify the classification made therein. It is true that the Legislature may have feared evil results from mixed boxing but this record establishes those fears to have been unfounded. Consistent with this record is what we believe to be common knowledge to the same effect.

Even if riotous conditions did result from mixed boxing exhibitions we doubt if this statute would be sustained by the Federal Supreme Court in view of language which we find in some of its opinions. In Brown v. Board of Education of Topeka, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. —, outlawing segregation in public schools, the Court quoted in part from the Slaughter House Cases, 16 Wall. 36, 21 L.Ed. 394, there cited, with the state-

ment that the Court there interpreted the Fourteenth Amendment "as proscribing all State-imposed discriminations against the Negro race" as follows:

"It ordains that no State shall deprive any person of life, liberty, or property, without due process of law, or deny to any person within its jurisdiction the equal protection of the laws. What is this but declaring that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color? The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race, —the right to exemption from unfriendly legislation against them distinctively as colored,—exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race."

In Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 18, 62 L.Ed. 149, the Court in holding void for want of "due process" under the Fourteenth Amendment, a city ordinance which prohibited negroes or whites, as the case might be, from living in blocks where the opposite race was predominant had this to say:

"* * * This drastic measure is sought to be justified under the authority of the state in the exercise of the police power. It is said such legislation tends to promote the public peace by preventing racial conflicts; that it tends to maintain racial purity; that it prevents the deterioration of property owned and occupied by white people, which deterioration, it is contended, is sure to follow the occupancy of adjacent premises by persons of color."

After discussing the Fourteenth Amendment the Court proceeded:

"In the face of these constitutional and statutory provisions, can a white man be denied, consistently with due process of law, the right to dispose of his property to a purchaser by prohibiting the occupation of it for the sole reason that the purchaser is a person of color intending to occupy the premises as a place of residence? * * * That there exists a serious and difficult problem arising from a feeling of race hostility which the law is powerless to control, and to which it must give a measure of consideration, may be freely admitted. But its solution cannot be promoted by depriving citizens of their constitutional rights and privileges. * * *.

"We think this attempt to prevent the alienation of the property in question to a person of color was not a legitimate exercise of the police power of the state, and is in direct violation of the fundamental law enacted in the Fourteenth Amendment of the Constitution preventing state interference with property rights except by due process of law. That being the case, the ordinance cannot stand."

This decision was followed by our own courts in Liberty Annex Corporation v. City of Dallas, Tex.Civ.App., Dallas, 289 S.W. 1067, affirmed Tex.Com.App., 295 S.W. 591.

It was no answer in that case to say that whites and negroes received the same treatment and it is no answer here for as said in Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 846, 92 L.Ed. 1161:

"The rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual. The rights established are personal rights. It is, therefore, no answer to

these petitioners to say that the courts may also be induced to deny white persons rights of ownership and occupancy on grounds of race or color. Equal protection of the laws is not achieved through indiscriminate imposition of inequalities."

■ Professional boxing being a lawful calling in this State we believe that statutes which regulate it fall within the inhibitions of the Fourteenth Amendment within the rule that

> "If some persons engaged in a calling or business * * * are subjected to special burdens or favored by special privileges while others engaged in the same calling or business are not so treated, the legislation is based upon unconstitutional discrimination." 12 Am.Jur., p. 186. See also Chaires v. City of Atlanta, 164 Ga. 755, 139 S.E. 559, 55 A.L.R. 230 and Alston v. School Board of City of Norfolk, 4 Cir., 112 F.2d 992.

■ When we consider this record and the Fourteenth Amendment, as interpreted by the United States Supreme Court, which we and all other officials of this State are sworn to preserve and defend, we have no hesitancy in declaring Sec. 11(f) of Art. 614, Texas Penal Code, to be in violation of the Fourteenth Amendment to the Constitution of the United States and is null and void.

The question remains as to the judgment to be rendered. We have concluded to reverse and remand rather than to render final judgment here. Our reasons for this are several.

Commissioner Morgan has evidenced complete, and we think proper, respect for the law as he found it and we are certain that he will faithfully and fairly enforce the law as it is determined to be without the necessity of judicial mandate.

Other reasons for reversing are that neither the parties nor the trial court have considered the impact, if any, of this decision upon the boxing and wrestling law

as a whole nor do they seem to have specially considered rules and regulations of the Commission with which appellant may or may not have complied.

We, therefore, reverse and remand this cause for trial in a manner consistent with this opinion.

Reversed and remanded.