226 F.2d 180
 The DETROIT HOUSING COMMISSION, a duly authorized Department
of the City of Detroit, Finlay C. Allen, President, Mary M.
Streit, Vice-President, Walter J. Gessel, George A. Isabel
and James H. Quello, Members; and Harry J. Durbin,
Director-Secretary of the Detroit Housing Commission, Appellants,
v.
Walter Arthur LEWIS et al., Appellees.
 No. 12305.
 United States Court of Appeals Sixth Circuit.
 Oct. 5, 1955.
 
 Vance Ingalls, Detroit, Mich. (Paul T. Dwyer, Helen W. Miller, Detroit, Mich., on the brief), for appellants.
 Constance Baker Motley, New York City (Willis M. Graves, Francis M. Dent, Detroit, Mich., Thurgood Marshall, New York City, on the brief), for appellees.
 Before ALLEN, McALLISTER and MILLER, Circuit Judges.
 ALLEN, Circuit Judge.
 
 
 1
 This is an appeal from a judgment of the District Court issuing a permanent injunction against The Detroit Housing Commission, its members, and Director-Secretary, in an action attacking racial segregation as claimed to be practiced in public housing projects carried on in Detroit by defendants.[1] The action prayed for a declaratory judgment that the policy, custom and usage of the defendants in refusing to lease to qualified Negro applicants certain units of public housing, solely because of the race and color of such applicants, and of segregating tenants into projects on the basis of race or color is in violation of the Constitution and laws of the United States. The case was tried upon a stipulation of facts, the pertinent parts of which are printed in the margin.[2]
 
 The District Court found:
 
 2
 'That the regulation, policy, custom, usage, conduct and practice of the defendants in refusing to lease to plaintiffs, and other eligible Negro applicants similarly situated, certain units of public housing under their administration, control and management in accordance with a strict policy of racial segregation, is a violation of the Constitution and laws of the United States, particularly the Fourteenth Amendment to the Constitution of the United States and Title 8, Sections 41 and 42 of the United States Code.*
 
 
 3
 'That the resolution of the Detroit Housing Commission adopted September 26, 1952, has not in fact ended the discrimination against the plaintiffs and members of their class, and that such discrimination on the basis of race and color in housing facilities under the auspices of public funds, local or federal, is in violation of the Fourteenth Amendment to the Constitution of the United States and Title 8, Sections 41 and 42 of the United States Code.'
 
 
 4
 The court concluded that plaintiffs and others similarly situated for whom this class action was instituted were, by reason of the segregation complained of, deprived of the equal protection of the laws as guaranteed by the Fourteenth Amendment. Defendants, their agents, employees, representatives and successors, were permanently enjoined from:
 
 
 5
 '1. Denying the plaintiffs, and members of the class which the plaintiffs represent, the right to lease any unit in any public housing project solely because of the race and color of the plaintiffs and members of the class which plaintiffs represent.
 
 
 6
 '2. Maintaining separate lists of eligible Negro and white applicants for public housing.
 
 
 7
 '3. Maintaining racially segregated public housing projects.'
 
 
 8
 Defendants contend (1) that the present policy and practices of The Detroit Housing Commission in allotting units in public housing do not violate the Fourteenth Amendment to the Constitution and Title 8 U.S.C. Sections 41, 42 and 43.*
 
 
 9
 We think the courts is clearly right in its conclusion that the claimed discrimination by The Detroit Housing Commission against plaintiffs and members of their class on the basis of race and color still exists. As shown by the stipulation as of May 31, 1950, the eligible pool of colored applicants for public housing included more than twice as many Negro as white families, and as of April, 1954, the eligible pool included more than twenty times as many Negro as white families. Meanwhile, the vacancies in public housing projects limited to white occupancy were seventeen times as many as those in public housing projects limited to Negro occupancy, there being on the date of the last official report of the Commission 51 vacancies in white and 3 vacancies in Negro projects. It also is conceded that separate lists of eligible Negro and white families are maintained, for the purpose of making the allotments.
 
 
 10
 While the recent decisions of the Supreme Court of the United States in the 4 education cases, Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 and 349 U.S. 294, 75 S.Ct. 753, in principle support the conclusion of the District Court that the practices of The Detroit Housing Commission violate the Fourteenth Amendment and the cited sections of the United States Code, plaintiffs' rights are not based solely upon education decisions. They have long been established in the adjudications of the Supreme Court and of the lower federal courts. Here plaintiffs are denied the right to lease housing facilities provided by public funds under conditions equal to those imposed upon applicants from white families. In Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149, decided in 1917, the Supreme Court considered an ordinance of the City of Louisville which forbade the occupation by a Negro of a residence in a block where the greater number of residences were occupied by white persons. The Supreme Court pointed out that this interdiction was based 'wholly upon color; simply that and nothing more', 245 U.S. at page 73, 38 S.Ct. at page 18, and held that the occupancy and, necessarily, the purchase and sale of property of which occupancy is an incident cannot be inhibited by the State or one of its municipalities, solely because of the color of the proposed occupant of the premises. As the Supreme Court said, 245 U.S. at page 77, 38 S.Ct. at page 19, with reference to the Fourteenth Amendment:
 
 
 11
 "What is this but declaring that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color?"
 
 
 12
 This decision was followed without opinion in Harmon v. Tyler, 273 U.S. 668, 47 S.Ct. 471, 71 L.Ed. 831, and in City of Richmond v. Deans, 281 U.S. 704, 50 S.Ct. 407, 74 L.Ed. 1128. In Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, decided in 1948, the Supreme Court held that private agreements to exclude persons of a designated race or color from the use or occupancy of real estate for residential purposes do not violate the Fourteenth Amendment. But the court declared that it is a violation of the equal protection clause of the Fourteenth Amendment for the state courts to enforce such agreements. To the same effect is Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586, decided in 1953. See also Dawson v. Mayor, 4 Cir., 220 F.2d 386, which holds that the ruling of Brown v. Board of Education of Topeka, supra, should be extended to public recreation.
 
 
 13
 On this appeal, defendants do not urge a reversal of the finding of the District Court that the 'separate but equal' doctrine has no place in public housing and constitutes a deprivation of constitutional rights. Nor do they urge a continuation of the doctrine of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, in connection with public housing. They state that they will not operate their facilities under any such doctrine or practice which has been disapproved with reference to public education in Brown v. Board of Education of Topeka, 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873. Their appeal is based on the contention that they should be given sufficient time within which to complete orderly and peaceful integration, and that the District Court erred in requiring them to integrate forthwith every public housing unit. Plaintiffs contend that the judgment of the District Court is not a forthwith order. We do not so construe it. If the stay ordered by this court had not intervened, the Housing Commission would have been required in obedience to the judgment to cease maintaining separate lists of eligible Negro and white applicants for public housing, to cease maintaining segregated public housing projects, and to cease denying plaintiffs and members of the class which they represent the right to lease any unit in any public housing project solely because of race or color. However, the judgment ordered a gradual and not an immediate change in occupancy of the housing units.
 
 
 14
 The complaint herein was filed on June 5, 1950, pretrial hearings were held in 1951, and after various continuances the case was heard on June 22, 1954, the judgment being entered on that day. Due to the pendency of the proceedings in this court there has been another appropriate delay in view of the possible application of Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, and the other three education cases pending in the Supreme Court of the United States. Five years have elapsed since the instant case was filed. As the Supreme Court points out in its latest pronouncement on these questions issued May 31, 1955, the local authorities must proceed in these matters 'with all deliberate speed.'
 
 
 15
 We bear in mind that the Supreme Court in Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 756, recognized that 'a variety of obstacles' might have to be eliminated to make the transition to a nondiscriminatory basis and that the administrative problems must be considered to secure equitable enforcement of the principles laid down therein and in the preceding opinion in the same case, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873.
 
 
 16
 We also realize that the later case declared that, while school authorities have the primary responsibility of elucidating, assessing, and solving these problems, the courts will have to consider whether the action of the school authorities constitutes good faith implementation of the governing constitutional principles. Applying these rules in the instant case we think it is self-evident that defendants have the primary responsibility for solving the problems presented by the required implementation of the constitutional principles declared. It also follows that 'Because of their proximity to local conditions and the possible need for further hearings, the courts which originally heard these cases can best perform the judicial appraisal,' whether the defendants are in good faith implementing the governing constitutional principles. Here over a period of more than four years the local District Court has given these questions extended consideration.
 
 
 17
 However, when the District Court entered the order in this case it did not have the advantage of the pronouncements of the Supreme Court in the later opinion in the education cases, Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, issued May 31, 1955. As indicated therein, the Supreme Court recognizes the existence of important administrative problems in the implementation of the principles declared. The District Court has not considered the instant case in the light of what now is the law governing transition from segregation to integration in the case of public facilities. The defendants may not find real obstacles in the way of full integration upon which they have already made substantial progress. The order of the District Court does not contemplate an immediate change of all or the greater number of occupants in any housing project. It contemplates that the applications for occupancy shall be considered and acted upon in order of their filing without reference to whether the applicants are white or colored.
 
 
 18
 If some obstacle which was not brought out in the hearing of this case should arise, and if plaintiffs should accuse defendants of obstruction and illegal delay, the defendants are entitled, under the doctrine of Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, to apply to the United States District Court for hearing and decision as to whether defendants are in good faith implementing the governing constitutional principles.
 
 
 19
 While we affirm the judgment, therefore, we remand the case to the District Court for further proceedings, if necessary, consistent with the judgment rendered by the Supreme Court in Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753.
 
 
 
 *
 Now 42 U.S.C.A. §§ 1981-1983
 
 
 *
 See note on page 182
 
 
 [1]
 The parties will be denominated as in the court below
 
 
 [2]
 'The defendant Detroit Housing Commission is presently maintaining and operating a number of public housing projects in the City of Detroit, Michigan. At the time of the filing of the original complaint in this cause, the defendant Commission maintained and operated one permanent low rent housing project, * * * with a total of 943 units to which only qualified Negro applicant families were admitted. At that time, it also maintained and operated four public housing projects, * * * with a total of 1,827 units to which only eligible Negro families were admitted. * * * At the same time, it maintained and operated projects * * * with a total of 325 units to which only qualified Negro veteran families are admitted. * * * At that time it also maintained and operated five permanent low rent projects to which only qualified white families are admitted. These projects * * * contain a total of 3,394 units. War housing projects maintained by the Commission at the time of the filing of the original complaint to which only qualified white families were admitted * * * (contain) a total of 3,454 units. Veterans' projects maintained by the Commission at the time of the filing of the original complaint and to which only qualified white veteran families are admitted * * * (contain) a total of 830 units
 'At the time of the filing of the original complaint in this action the defendants were engaged in the construction of additional permanent low rent housing projects pursuant to the provisions of the United States Housing Act of 1937 as amended by the United States Housing Act of 1949 (title 42, U.S.C., Secs. 1401-1433 (42 U.S.C.A. §§ 1401-1433)) as amended.
 'Since the filing of the original complaint in this action portions of two projects have been completed. These projects are Edward J. Jeffries Homes with a total of 714 units completed, and Frederick Douglas Homes with a total of 334 units completed. Each of these projects is presently under construction and when completed, Jeffries Homes will have a total of 2170 units and Douglas Homes a total of 1006 units.
 'One of these projects, Jeffries Homes, is presently a racially integrated project as respects its racial occupancy pattern.
 'The other project, Douglas Homes, was designated in the application for federal assistance for Negro occupancy.
 'One of the war housing projects, Fisher Homes, formerly limited to occupancy by white families is presently racially integrated.
 'All the of public housing projects in the City of Detroit, permanent low rent, war housing both temporary and permanent, and veterans' housing were and are all constructed pursuant to federal housing statutes whereby federal financial assistance is provided.
 'As of May 31, 1950, just before the original complaint in this action was filed, the eligible pool of certified applicants for public housing was:
 White families .... 1,838
 Negro families .... 4,942
 'As of April 1954 or as of the present, the eligible pool of certified applicants for public housing is:
 White families ...... 383
 Negro families .... 7,709
 'Since the original complaint in this action was filed vacancies have occurred in public housing projects limited to white occupancy and vacancies have occurred in public housing projects limited to Negro occupancy as follows:
 White projects .... 4,417
 Negro projects ...... 865
 'Based on the last official report, April-May 1954, of the Detroit Housing Commission, there are the following vacancies:
 White projects .... 51
 Negro projects .... 3"
 A resolution adopted by the Commission on September 26, 1952, read as follows:
 'In the selection and removal of tenants of housing projects, the Commission will be guided by the best interests of all the people of the City for the purpose of protecting their rights and interests and the promotion of harmony amongst them, all in accordance with the Constitution and laws of the United States and of the State of Michigan.'
 This statement of policy supplanted the statement theretofore existing which was as follows:
 'The Detroit Housing Commission will in no way change the racial characteristics of any neighborhood in Detroit through occupancy standards of housing projects under their jurisdiction.'
 'The defendants presently maintain and enforce a policy in public housing projects which operates as follows:
 '(1) Certain projects were designated prior to their erection for white occupancy or for Negro occupancy.
 '(2) No eligible Negro family is admitted to a vacancy in a project presently limited to white occupancy and no white family is admitted to a vacancy in a project presently limited to Negro occupancy.
 '(3) The application blanks which must be filled out by prospective tenants request information concerning the applicant's race and request the applicant to indicate whether he or she desires to live either in the 'east' or 'west'.
 '(4) Separate lists of eligible Negro and white families are maintained.
 '(5) In certain other projects presently not designated either as white or Negro, white and Negro families are and have been admitted without regard to race or color.
 'The Jeffries Project, which was opened for occupancy and which will have 2150 units, has been completely integrated and applicants certified without regard to race or color; also, since adoption of the foregoing resolution, Fisher Temporary Project of 500 units, formerly designated as a white project, was integrated, and applicants certified without regard to race or color; also, since adoption of the resolution of September, 26, 1952, appearing appearing at paragraph 27 above, the new Douglas Project with occupancy of 1006 units and the programmed project designated as Mich. 1-11, the site for which is now under condemnation, with a planned occupancy of some 3,874 units, formerly designated for Negro occupancy, are integrated projects.
 'In permanent projects presently under operation there are approximately 4,000 white families and approximately 2,127 Negro families.'
 No question is raised as to 'the physical equality of the separate housing facilities provided for Negro and white tenants.'
 'Records of the Housing Commission currently show that there are a total of 7,709 Negro applicants and 383 white applicants for public housing listed as eligible based on the application as made. Eligibility is subject to final determination at time of admission.
 'Each family admitted to a public housing unit is required to sign a lease Granted by the Detroit Housing Commission.
 'White families with a lesser preferential status than some of the plaintiffs, and some of the members of the class on behalf of which plaintiffs sue, have been admitted to public housing units to which, but for race, some of the plaintiffs and some of the members of their class would have been admitted.'