Rives, Circuit Judge, dissented in part.

Arthur Burns, Gadsden, Ala., for appellants.

John A. Lusk, Jr., W. B. Dortch, Gadsden, Ala., Dortch, Allen & Meighan, Lusk, Swann & Burns, Gadsden, Ala., of counsel, for appellees.

Before RIVES, CAMERON and JONES, Circuit Judges.

RIVES, Circuit Judge.

This appeal is from a final judgment for defendants. The plaintiffs seek a declaration and injunction against the execution and putting into effect of certain urban redevelopment plans of the City of Gadsden, Alabama, attacked upon the ground that they foster enforced racial segregation. The district court entered judgment in favor of defendants pursuant to findings of fact and conclusions of law, now reported in 174 F.Supp. 64, with which all of the members of this Court were tentatively in agreement

**E. F. BARNES, J. C. Carson, J. Jelks and J. Robertson, Appellants,**

v.

**CITY OF GADSDEN, ALABAMA, et al., Appellees.**

**No. 17534.**

United States Court of Appeals
Fifth Circuit.

June 30, 1959.

Rehearing Denied Sept. 4, 1959.

in our first conference following the argument and submission of this appeal. After further study and more mature deliberation, Judges Cameron and Jones adhere to that view while the writer concurs in part and dissents in part for reasons separately stated. The judgment is therefore

Affirmed.

RIVES, Circuit Judge (concurring in part and dissenting in part).

A careful study of the record and exhibits has convinced me that there are controlling additional facts, themselves either undisputed or conclusively established, which were not noted in the district court's findings of fact. Recognizing the importance of this litigation to the public, as well as to the litigants, I have set forth those facts at considerable length in an appendix to this opinion. Excluding those items of doubtful value or of questionable admissibility, but otherwise carefully considering the entire record, I cannot escape the conclusion that *actual* segregation is contemplated. So long as that is voluntary, rather than governmentally enforced, there can be no constitutional objection. As we said in Cohen v. Public Housing Administration, 5 Cir., 1958, 257 F.2d 73, 78:

> "Mr. Stillwell's testimony has been noted (footnote 7, supra) to the effect that in his opinion actual segregation is essential to the success of a program of public housing in Savannah. If the people involved think that such is the case and if Negroes and whites desire to maintain voluntary segregation for their common good, there is certainly no law to

prevent such cooperation. Neither the Fifth nor the Fourteenth Amendment operates positively to command integration of the races but only negatively to forbid governmentally enforced segregation.[11]

> "11. Cf. Avery v. Wichita Falls Independent School District, 5 Cir., 1957, 241 F.2d 230, 233; Rippy v. Borders, 5 Cir., 1957, 250 F.2d 690, 692."

That governmentally enforced segregation in housing is unconstitutional has now been settled beyond controversy.[1] The cases just cited in footnote 1 make clear that a State agency has no constitutional power to oust persons of one race from their homes and thereafter forcibly to restrict the land to the exclusive occupancy of persons of another race. Ultimately then, the issue on its merits must turn upon whether the contemplated actual segregation is to be voluntary or governmentally enforced. At the present stage the plaintiffs and the defendants face real, though different, dilemmas in reaching that issue. The plaintiffs feel that they cannot wait longer. As their attorney stated to the district court:

> "Mr. Burns: That is the very reason why we have to do this now. If we wait until the private developers get it into their hands, it's too late.

> "In that Levitown case, where the Court said that the Court would not require the private developer to sell; allowed him to discriminate, where it was without dispute that he was discriminating and the Court let him do it."

1. Buchanan v. Warley, 1917, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149; Harmon v. Tyler, 1927, 273 U.S. 668, 47 S.Ct. 471, 71 L.Ed. 831; City of Richmond v. Deans, 1930, 281 U.S. 704, 50 S.Ct. 407, 74 L.Ed. 1128; Shelley v. Kraemer, 1948, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161; Barrows v. Jackson, 1953, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586; City of Birmingham v. Monk, 5 Cir., 1950, 185 F.2d 859; Detroit Housing Commission

v. Lewis, 6 Cir., 1955, 226 F.2d 180; Tate v. City of Eufaula, Alabama, D.C., M.D.Ala.1958, 165 F.Supp. 303; Jones v. City of Hamtramck, D.C.E.D.Mich. 1954, 121 F.Supp. 123; Vann v. Toledo Metropolitan Housing Authority, D.C. N.D.Ohio 1953, 113 F.Supp. 210; Banks v. Housing Authority, 1953, 120 Cal.App.2d 1, 260 P.2d 668; Taylor v. Leonard, 1954, 30 N.J.Super. 116, 1954, 103 A.2d 632.

In its conclusion of law the district court recognized, if it did not resolve, the plaintiffs' dilemma [174 F.Supp. 67].:

"The Court concludes from an analysis of plaintiffs' complaint, evidence and arguments that their claim for relief is grounded primarily on the apprehension that when the two areas are cleared and rehabilitated and sold to private interests under legitimate restrictions as to use that plaintiffs and members of their class will not be able to purchase property in the Birmingham Street Area because of their race or color, Dorsey v. Stuyvesant Town Corp., 299 N.Y. 512, 87 N.E.2d 541, 14 A.L.R.2d 133, certiorari denied 339 U.S. 981, 70 S.Ct. 1019, 94 L.Ed. 1385, and that if they purchase homes in the North Fifth Street Area they will be racially segregated in that area, and, therefore, they should be delivered from the apprehension of this possible dilemma by injunctive relief, preventing the carrying out of the plans which, they insist, constitute a scheme and design for initiating, enforcing, extending and perpetuating racial segregation in residential areas of Gadsden in violation of their constitutional rights. Otherwise, they see no escape from their anticipated predicament once the properties are sold to private interests; and they are fearful in that event that their last state will become worse than their first.

\* \* \* \* \* \*

"If the Court assumes that private interests will restrict sales in the Birmingham Street Area to white people and the North Fifth Street Area to colored people, such sales would not be actions under color, authority, or constraint of state law, nor would they be the performances of functions of a governmental character. Dorsey v. Stuyvesant Town Corp., supra, Johnson v. Levitt & Sons, Inc., D.C.E.D.Pa., 131 F.Supp. 114."

The defendants, on their part, stoutly deny that any enforced segregation is contemplated. Their brief states:

"In this case no one is compelled to occupy the new houses to be constructed, and no one is prohibited from purchasing such houses; anyone buying any of the property will have to buy it with full knowledge that there can be no discrimination in the future.

\* \* \* \* \* \*

"The court should assume that the defendants, their agents and successors in office, after receiving the federal assistance in this public project, will, upon completion of this project, or in carrying it out, recognize the law to the effect there can be no governmentally enforced segregation solely because of race or color. Tate v. City of Eufaula [Alabama, D.C.], 165 F.Supp. 303."

The defendants point out that the plaintiffs may not, when the time comes, want to move back into either of the Areas:

" \* \* \* it boils down to the question of whether a complaint based on plaintiffs' alleged fears that they may not be able to repurchase land in the redeveloped area states a cause of action upon which relief can be granted. It is obvious that such redevelopment cannot be accomplished in a short period of time. It is equally obvious that not only plaintiffs but all occupants of the North Fifth Street area and the Birmingham Street area must be moved and relocated pending such clearance. It is by no means clear that plaintiffs or any of the occupants of these areas will even want to move back into such areas after redevelopment. Yet these plaintiffs are insisting that the entire slum clearance project be stopped on such a complaint."

I agree that the serious injury which the public may suffer from the stoppage of the slum clearance projects, and the

desire to afford every opportunity for the voluntary cooperation of the members of all races for their common welfare and betterment are potent factors tending to cause the Court to exercise its discretion to deny an injunction at the present stage of development of the plans. As said by Judge Sibley, speaking for this Court in Kelliher v. Stone & Webster, 5 Cir., 1935, 75 F.2d 331, 333, 334:

> " * * * and when a public improvement is sought to be stopped, the inconvenience to the public, as weighed against a slight or remediable wrong to the plaintiff, may determine the court of equity against this discretionary remedy."

The injury which the plaintiffs anticipate, namely, that they may be forced to dispose of their homes for an unconstitutional purpose, cannot be called slight. Rather, the questions are whether the plaintiffs will suffer a legal wrong and whether, at the present stage, their plight is irremediable. If irreparable injury to the plaintiffs will ensue, and if such injury cannot be otherwise prevented, then a suit for injunction restraining the carrying out of the plans is appropriate to present the question of a proposed unlawful exercise of the power of eminent domain for the purpose of subjecting the property taken to a racially discriminatory and unconstitutional use.[2]

The "Controls on Redevelopment," including the requirement of an anti-racial covenant, go a long way to protect the plaintiffs from governmentally enforced segregation. They do not, however, afford adequate protection if the redeveloper is free to restrict sales in the Birmingham Street Area to white people and in the North Fifth Street Area to Negroes. Enforced segregation might well be the practical result, whether or not so intended by the defendants. The plaintiffs might derive some small comfort from hearing a court tell them that their segregation was privately enforced rather than governmentally enforced. They might still feel that they stood equal before the law.

While the district court entered formal judgment for the defendants, it did not in fact decline to make *any* declaration of the rights of the parties, but in those parts of its conclusions of law which I have quoted, 174 F.Supp. at page 68, as construed in connection with the cases cited, it held that the redeveloper is a mere private individual and as such free to discriminate in sales to persons of different races. For reasons presently to be stated, I do not agree with that conclusion, but, by the same token, I do agree that injunction at the present stage of development of the plans should be denied.

The district court relied upon two cases in considering that sales by the redeveloper would not constitute state action within the meaning of the Fourteenth Amendment. Dorsey v. Stuyvesant Town Corporation, 1949, 299 N.Y. 512, 87 N.E.2d 541, 14 A.L.R.2d 133, and Johnson v. Levitt & Sons, D.C.E.D.Pa. 1955, 131 F.Supp. 114. In the Johnson case the district court held that F.H.A. and V.A., as federal agencies guaranteeing mortgages on housing projects, had no duty to prevent discrimination in sales of houses, and injunction did not lie to restrain agencies from insuring mortgages so long as the project proprietor discriminated against purchasers because of race and color.[3]

In Dorsey v. Stuyvesant Town Corporation, supra, the New York Court of Appeals held that a corporation organized under the New York Redevelopment Com-

---

**2.** City of Los Angeles v. Los Angeles Gas & Electric Corporation, 1919, 251 U.S. 32, 40 S.Ct. 76, 64 L.Ed. 121; Iowa Electric Light & Power Co. v. City of Lyons, Neb., D.C.Neb.1958, 166 F.Supp. 676, 680; Quinn v. Dougherty, 1928, 58 App.D.C. 339, 30 F.2d 749; Reichelderfer v. Quinn, 1931, 60 App.D.C. 325, 53

F.2d 1079, reversed on merits 1932, 287 U.S. 315, 53 S.Ct. 177, 77 L.Ed. 331; 30 C.J.S. Eminent Domain §§ 403, 407; 18 Am.Jur., Eminent Domain, Sec. 386.

**3.** Compare Ming v. Horgan, Super.Ct. Sacramento County, Calif., 1958, reported in 3 Race Relations Law Reporter 693.

panies Law, McKinney's Unconsol.Laws, § 3401 et seq., to provide low-cost housing is not an agency of the state and hence is not prohibited by the equal protection clauses of the State and Federal Constitutions from discriminating against prospective tenants because of race, color, or religion. The case is unusually well considered both by Judge Bromley, speaking for the majority of four, and by Judge Fuld, speaking for the three dissenting judges. The majority arrives at the conclusion that:

> "* * * The aid which the State has afforded to respondents and the control to which they are subject are not sufficient to transmute their conduct into State action under the constitutional provisions here in question." 299 N.Y. 536, 87 N.E.2d 551, 14 A.L.R.2d 146.

The extent of the aid furnished by the State and Federal Governments to the redeveloper and of the control to which the redeveloper is subject readily distinguishes the present case from either of the cases upon which the district court relied. In Johnson v. Levitt & Sons, supra, the federal agencies simply guaranteed mortgages on housing projects. In Dorsey v. Stuyvesant Town Corporation, supra, the City of New York agreed to condemn the land necessary for the project and to grant a tax exemption, but the full cost of construction and land acquisition was to be borne by the corporation. In the present case, the entire cost of land acquisition, and of the land itself, less such "use value" as may be required to be paid by the redeveloper,

is to be borne by government funds, approximately two-thirds by the United States and one-third by the City of Gadsden. Of even more importance, the redeveloper is an essential participant in the overall plans for redevelopment here involved. The federal statute made it necessary for the Authority to require the redeveloper to carry the plan into execution.[4]

The formal plans approved by the City of Gadsden contained detailed and specific "Controls on Redevelopment" requiring "The redeveloper to begin and complete the development of Project Land acquired by it for the use required by the Redevelopment Plan * * *." If Dorsey v. Stuyvesant Town Corporation, supra, had presented a like extent of governmental aid and of state control of the corporation, I believe that the majority must have agreed with the dissenters' view that:

> "* * * Unmistakable are the signs that this undertaking was a governmentally conceived, governmentally aided and governmentally regulated project in urban redevelopment." 299 N.Y. 542, 87 N.E.2d 555, 14 A.L.R.2d 150.

I would not repeat a reference to the authorities so well discussed in Dorsey v. Stuyvesant Town Corporation, supra, but would refer briefly to a few later decisions. Among these is our own case of Derrington v. Plummer, 5 Cir., 1956, 240 F.2d 922, in which we held that, where a county leases a cafeteria in a newly constructed courthouse to a private tenant operator, the tenant's exclusion of per-

---

4. "§ 1455. *Requirements for loan—or capital-grant contracts*

"Contracts for loans or capital grants shall be made only with a duly authorized local public agency and shall require that—

\* \* \* \* \* \* \*

"Obligations of purchasers, lessees, and assignees of property

"(b) When real property acquired or held by the local public agency in connection with the project is sold or leased, the purchasers or lessees and their assignees shall be obligated (i) to devote such property to the uses specified in

the urban renewal plan for the project area; (ii) to begin within a reasonable time any improvements on such property required by the urban renewal plan; and (iii) to comply with such other conditions as the Administrator finds, prior to the execution of the contract for loan or capital grant pursuant to this subchapter, are necessary to carry out the purposes of this title: *Provided*, That clause (ii) of this subsection shall not apply to mortgagees and others who acquire an interest in such property as the result of the enforcement of any lien or claim thereon." 42 U.S.C.A. § 1455(b).

sons merely because they were Negroes constituted state action in violation of the Fourteenth Amendment.[5]

In N.A.A.C.P. v. State of Alabama, 1958, 357 U.S. 449, 462, 463, 78 S.Ct. 1163, 1172, 2 L.Ed.2d 1488, the Supreme Court said:

"We think that the production order, in the respects here drawn in question, must be regarded as entailing the likelihood of a substantial restraint upon the exercise by petitioner's members of their right to freedom of association. Petitioner has made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility. Under these circumstances, we think it apparent that compelled disclosure of petitioner's Alabama membership is likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure.

"It is not sufficient to answer, as the State does here, that whatever repressive effect compulsory disclosure of names of petitioner's members may have upon participation by Alabama citizens in petitioner's activities follows not from *state* action but from *private* community pressures. The crucial factor is the interplay of governmental and private action, for it is only after the initial exertion of state power represented by the production order that private action takes hold."

A few other late Supreme Court cases illustrative of the principle that governmental action may include the action of a private person who performs a governmental function are: Brotherhood of Railroad Trainmen v. Howard, 1952, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283; Terry v. Adams, 1953, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152, and Commonwealth of Pennsylvania v. Board of Directors of City Trusts, 1957, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792.

In my opinion, the plan has not been completed until the property passes out of the control of the redeveloper, and hence in disposing of property within either of the Areas the redeveloper may not discriminate between purchasers on the basis of race or color. We should, I think, follow the course so well outlined by Judge Johnson of the Middle District of Alabama in Tate v. City of Eufaula, Alabama, D.C.M.D.Ala.1958, 165 F.Supp. 303, 306, 307:

"* * * this Court must now assume that these defendants, their agents and successors in office, after receiving the federal assistance in this public project, will, upon a completion of this project (or any phase of it), recognize the law that is now so clear; this law being to the effect that there can be no governmentally enforced segregation solely because of race or color. * * *

"If these defendants, their agents or successors, as public officers and with federal financial assistance complete this project or any phase of it, they do so with the certain knowledge that there must be a full and good faith compliance with this existing law."

I agree that the judgment should be affirmed in so far as it denies an injunction, but, to the extent that it seems to me actually but erroneously to declare the rights of the parties, I think that the judgment should be reversed and judgment here rendered declaring such.

---

5. That holding, it may be noted, was cited with approval by the Supreme Court in Cooper v. Aaron, 1958, 358 U.S. 1, 17, 78 S.Ct. 1401, 3 L.Ed.2d 5.

rights as stated in this opinion. I therefore concur in part and dissent in part.

## APPENDIX

### Material Facts Not Fully Set Forth in the District Court's Findings.

The City of Gadsden is an Alabama municipal corporation,[1] and the Greater Gadsden Housing Authority is a public body corporate organized under the laws of the State of Alabama.[2]

Each of the four Negro plaintiffs owns a house in which he resides located in the Birmingham Street Area. Each member of the represented class of about fifty other Negro citizens owns a house in one of the areas planned for redevelopment. The North Fifth Street Area contains a considerable amount of vacant land and is planned to be redeveloped ahead of the Birmingham Street Area, so as to provide living space in the form of 128 small building lots for some of the families displaced by the later demolition of the Birmingham Street Area. The latter area is then to be redeveloped to provide 121 large building lots for single-family homes. The Authority admits in its answer that it plans to purchase or acquire by eminent domain all of the property in the two Areas planned for redevelopment.

The Agreements between the City and the Authority disclose that, in order for the Authority to effectuate the plans,

"\* \* \* the assistance of both the Federal Government and the City is required; namely of the Federal Government by lending funds needed to defray the gross cost of the Project, and upon completion of the project and repayment of such loan, by contributing two thirds (⅔) of the net cost of the project; and of the City by making certain local grants-in-aid (as specified by Title I of the Housing Act of 1949, as

amended) as hereinafter provided, in a total amount equal to at least one-third (⅓) of the net cost of the Project \* \* \* ."

The formal redevelopment plan of the North Fifth Street Area approved by the City provides that:

"The North Fifth Street area will, after redevelopment, provide 141 units, with FHA Committments [sic] (tentatively approved) open to non-white occupancy. 73 single family sales units in the price range of $6,500 to $8,500, 64 duplex units in the rental ranges of $40.00, $45.00 and $50.00 shelter rent per month, will be available.

\*　\*　\*　\*　\*　\*

"c. Recreational and Community Facilities—The setting aside of land for the use of the City for the erection of a needed Civic Center with adjacent playfield and picnic area is in keeping with the adjacent facilities already erected (Negro Swimming Pool three blocks away). Also the City Board of Education took into consideration the Redevelopment Plan when they erected an elementary school which is located approximately eight blocks away from the Project Area."

After reading the foregoing paragraph, Mr. Mills testified: "That is in fact a colored school."

The formal redevelopment plan of the Birmingham Street Area approved by the City also states: "The North Fifth Street area will, after redevelopment, provide 138 units, with FHA Committments [sic] (tentatively approved) open to Negro Occupancy."

The document principally relied on by the plaintiffs was made Exhibit A to their complaint, and consisted of an elaborate printed brochure captioned, "Gadsden Redevelopment." Its prepara-

---

1. The laws of Alabama authorize the City to join in the execution of the plans for urban redevelopment. 1940 Code of Alabama, Title 25, Section 3.

2. The powers of the Authority are detailed in 1940 Code of Alabama, Title 25, Section 12. Section 15 of the same title vests the Authority with the right to acquire property by eminent domain.

tion was paid for by the Federal Government. It was the only document handed out to the general public at the time of a public hearing required by 42 U.S.C.A. § 1455(d) to be held in connection with the redevelopment plans. At that hearing Negro citizens voiced their objections to the plans.

Mr. Wedge, Regional Director of the Urban Renewal Administration, testified:

"A. That particular brochure was submitted to our agency in connection with the planning and survey materials prepared with the benefit of the preliminary advance of funds.

"Q. All right, sir. I believe you said or did I understand you to say that this brochure here was submitted to your agency by the Greater Gadsden Housing Authority? A. It was submited as a part of the supporting documentation accompanying the applications."

The parts of that document upon which the plaintiff rely are quoted in the margin.[3]

3. "Sites Selected for Redevelopment

"The Birmingham Street Site

"The Master Plan describes the Birmingham Street Area as ' * * * lying in the flat land at the head of Rum Branch, formerly a servants' quarters section that became pocketed by better class residential development. Lack of space for expansion led to "building between" until now these few blocks contain 250 dwellings. The area is occupied by Negroes, but the number is too few to justify provisions of proper recreational, school, and social facilities.'

"The recent survey brought out, more forcefully because it was more detailed, the facts stated in the Master Plan's diagnosis: the poor quality of housing, lack of public and community facilities, and overcrowding. These conditions are in strong contrast to those of the surrounding section which, except for a small commercial center to the north, is characterized by homes of good quality.

"The opportunity to reconstitute the area as a residential district in harmony with its surroundings was the main reason for its selection as the number one redevelopment site.

"The North Fifth Street Site

"A relatively small amount of housing —standard or substandard—exists on the North Fifth Street site. This, in fact, is the principal reason for its selection as a companion project to the Birmingham Street one: it will permit redevelopment for a greater number of families than clearance of the site will displace, thus affording home sites for those occupants of the Birmingham Street site who are not eligible for relocation in public housing or who, for reasons of their own, prefer single-family or duplex dwellings.

"A second important reason for selection of this area for redevelopment is the incentive it will provide for further extension of the Negro neighborhood up along the foothills of Shinbone Ridge. While some of the terrain is steep, much of it is gently rolling and well drained; this can be developed as an open residential section, convenient to school and social centers as well as to the central business district and industries of the city.

"The Projected Plans
* * * * * * *

"North Fifth Street Area

"In most Southern cities there is a scarcity of vacant land located close to schools and churches and shopping districts and served by city utilities and transportation, land that is suitable and desirable for expansion of Negro neighborhoods or creation of new ones. This is true of Gadsden.

"But sometimes careful search will reveal areas that have been overlooked or by-passed or, for some other reason, have not been exploited for this purpose. The North Fifth Street site is such an area.

"Blighted in its south part and spoiled for residential use north of Tuscaloosa Avenue by a sprawling but small industrial enterprise, this site is, nevertheless, one that offers the possibility for a new offshoot from the Tuscaloosa Avenue neighborhood. It is close to schools, churches, lodges, swimming pool, and playgrounds, as well as to the Tuscaloosa Avenue business section. It can easily be served with city utilities.

"Most importantly, it gives, to the north, onto a large open space that can be used for expansion of the small development to be created initially through this program.
* * * * * * *

"Use of Land
* * * * * * *

"North Fifth Street Area
* * * * * * *

"A feature of the plan is the four-acre site allocated to a community center;

The plaintiffs rely also on "Local Public Agency Letter No. 16" issued by the Director of the Housing and Home Finance Agency on February 2, 1953, and reading in part as follows:

"The general procedures developed in the course of actual operating experience from the joint efforts of the local and Federal agencies to assure that the living space available in a community to Negro and other racial minority families is not decreased are based upon the following:

"A slum or blighted area presently occupied in whole or in part by a substantial number of Negro or other racial minority families may be cleared and redeveloped if:

"1. The area is to be redeveloped as a residential area and the housing is to be available for occupancy by all racial groups (at rents or sales prices within the financial capacity of a substantial number of Negro or other racial minority families in the community), or

"2. The area is to be redeveloped as a residential area and a proportion of the housing bearing reasonable relationship to the number of dwelling units in the area which were occupied by Negro or other racial minority families prior to its redevelopment is to be available for occupancy by Negro or other racial minority families, or

"3. The area is to be redeveloped as a residential area but the housing is not to be available for occupancy by all racial groups or for occupancy

here the city will in future construct an auditorium to serve the Negro community. A small play-field to augment existing recreational facilities in the neighborhood will be provided in conjunction with the center.

\* \* \* \* \* \* \*

"Birmingham Street Area

\* \* \* \* \* \* \*

"Located half a mile from the central business district, the Birmingham Street section will offer spacious home sites on quiet residential streets, newly paved and serviced with utilities.

"North Fifth Street Area

"Like the Birmingham Street Area, this area is only a short distance from the central business district of the city. And it is equally well served with city utilities and community facilities, elementary and high schools for Negro children being less than half a mile away. The North Fifth Street Area is, in fact, virtually the only such close-in land available for expansion of the Negro community.

\* \* \* \* \* \* \*

"Provision is made at the north extreme of the area for continuing North Fifth Street beyond this site so that the Negro neighborhood can be expanded by private developers.

"Survey Areas

\* \* \* \* \* \* \*

"Birmingham Street Survey Area

"The core of this area is a group of squalid dwellings occupied by Negro families, some of whose grandparents undoubtedly also occupied this same old servants' quarters section. There are no

schools, parks, or social facilities, but the residents have built several churches which fill an important social need as well as the religious one.

\* \* \* \* \* \* \*

"Community Facilities

"Birmingham Street Survey Area

\* \* \* \* \* \* \*

"Of the five churches, two serve the Negro neighborhood at Birmingham Street, the others having city-wide white congregations.

\* \* \* \* \* \* \*

"Racial Occupancy

"While occupancy of dwelling units in the Birmingham Street Survey Area is evenly divided (323 white and 331 Negro), it is the sections of Negro occupancy—Birmingham-Bay Streets and St. John's Alley—that coincide with the sections of blighted housing.

\* \* \* \* \* \* \*

"In the North Fifth Street Survey Area Negro families occupy about 40% of the dwellings, but the fact that so little of the area is built up leaves its future racial status still in doubt. North of Tuscaloosa Avenue only specific planning, such as is advocated in this redevelopment proposal, can forecast the future racial occupancy."

That document also contained a colored map with "Source: City Directory, 1952" showing "Racial Occupancy and Home Ownership" and other maps showing the projected plans for the North 5th Street area, including a "Proposed Colored Auditorium" and "Playfield (Col.)."

by Negro or other racial minority families, and:

"A. Decent, safe, and sanitary housing available for occupancy by Negro, or by other minority group, families (in an amount substantially equal to the number of dwelling units in such area which were occupied by Negro or other racial minority families prior to its redevelopment) is made available (at rents or sales prices within the financial capacity of a substantial number of Negro or other racial minority families in the community) through new construction in areas elsewhere in the community or in adequate existing housing in areas elsewhere in the community not theretofore available for occupancy by Negro or by other racial minority families, which areas are not generally less desirable than the area to be redeveloped, and

"B. Representative local leadership among Negro or other racial minority groups in the community has indicated that there is no substantial objection thereto, or * * ."

Referring to that letter, Mr. Wedge testified that: "Paragraph 3 of L.P.A. 16 has (n)ever been used or applied by the Housing and Home Finance Agency to promote any form of housing restricted to occupancy by members of the colored race."

Mr. Wedge further testified:

"Since L.P.A. Letter No. 16 contains administrative guides for reviewing one of the many aspects of an urban renewal project, the Birmingham Street Project was reviewed in the light of so-called procedure No. 3 as well as many, many other procedures and requirements of the agency."

After some understandable hesitation, both Mr. Wedge and Mr. Mills were commendably frank and candid to the effect that the plans contemplated actual segregation of the races.

Mr. Wedge testified:

"Q. Then I will ask you the same question with reference to the Birmingham Street area. It is contemplated that the Birmingham Street area when redeveloped will be available for any non-white occupancy? A. The relocation plan, as I mentioned, is the place where we have to look carefully under the provisions of 105(c) to determine the financial ability of displaced families and, therefore, North Fifth Street is a factor in the feasibility of relocation strictly from an economic point of view. With respect to the Birmingham Street, the plans in compliance with the federal law conform to the plan for the community as a whole and of the neighborhood in particular, and in that case on the basis of marketability studies and indications of probable types of development, it appeared that the land there would be substantially more costly than the land that would be provided in the North Fifth Street area. Does that answer your question?

"Q. Well, yes, sir, I think it does substantially answer it except for one minor point that I would like to get completely clear. The fact is, then, that whether it is because of economics or for whatever other reason, the Urban Renewal Administration does not contemplate that the Birmingham Street area will be available for non-white occupancy? A. We do not contemplate that."

Mr. Mills testified:

"Q. I will ask you if it is not a matter of policy, custom and usage for all housing projects in the City of Gadsden to be racially segregated? A. The projects occupied by white people are built in white areas. And the ones occupied by colored people are in the colored areas.

"All applications are received in one central office, and they are all processed by the same person, and

the housing, as it becomes vacant is made available to them."

As to low rent public housing to be administered directly by the Authority, Mr. Mills testified:

"Q. You don't plan any new construction of low rent public housing? A. Oh yes.

"Q. Have you set any date? A. Some future time.

"Q. Even any date within years? A. Do you want me to answer your question?

"Q. Has any date been set within even a period of three or four years? A. No, there has been no date set, but a reservation of two hundred units has been made.

"Q. Will they be for white or colored? A. It is dependent on the need.

"Q. In any event, will they be segregated or desegregated? A. They will follow the community pattern of Gadsden, which is segregated public housing.

"Q. We come back to the same thing, if any of these plaintiffs are eligible and do, either by choice or necessity, move into a low rent housing project, it will be a segregated low rent housing project? A. Oh yes.

"Q. If it is in Gadsden. A. That is right."

Mr. Mills insisted, however, that there was no requirement of racial segregation:

"A. Of course, Mr. Burns, all the way through, in both the preliminary and the other plan there has been this anti-restrictive clause, anti-racial clause in it. And we haven't said that Negroes shall live or shall not live in either one of these areas in the redevelopment plan as adopted."

In the formally approved redevelopment plan of the Birmingham Street Area, it is provided under the heading of "Controls on Redevelopment":

"a. Redeveloper's Contracts—In addition to such conditions and requirements as the Authority may deem desirable, each contract and deed with a redeveloper shall also require:

\* \* \* \* \* \*

"b. Covenants Running with the Land—Notwithstanding the provisions of any zoning or building ordinances or regulations, now or hereinafter in force, the following shall be incorporated as covenants inappropriate [sic] disposition instruments by reference to a written declaration thereof recorded simultaneously with the new plat of the Project Area. These covenants are to run with the land and shall be binding on all parties and persons claiming under them for the period of time this Redevelopment Plan is in effect, except that the Anti-Racial Covenant paragraph (2) (c) below shall run in perpetuity.

\* \* \* \* \* \*

"(2) General Covenants

\* \* \* \* \* \*

"(c) Anti-Racial Covenant—No covenants, agreement, lease, conveyance or other instrument shall be effected or executed by the Authority, or by the purchasers or lessees from it or any successors in interest of such purchasers or lessees, whereby land in the Project Area is restricted upon the basis of race, creed or color, in the sale, lease or occupancy thereof."

Section 106 of "Part II of Loan and Grant Contract between a Local Public Agency and the United States of America" provides in part:

"(C) *General Requirements Concerning Land.*—The Local Public Agency will:

"(1) Take all reasonable steps to remove or abrogate or to cause to be removed or abrogated, any and all legal enforceable provisions in any and all agreements, leases, conveyances or other instruments restrict-

ing, upon the basis of race, creed or color, the sale, lease or occupancy of any land in the Project Area which the Local Public Agency acquires as a part of the Project;

"(2) Not itself effect or execute, and will adopt effective measures to assure that there is not effected or executed by the purchasers or lessees from it (or the successors in interest of such purchasers or lessees), any agreement, lease, conveyance or other instrument whereby Project Land which is disposed of by the Local Public Agency is restricted, either by the Local Public Agency or by such purchasers, lessees or successors in interest, upon the basis of race, creed or color, in the sale, lease or occupancy thereof;

\* \* \* \* \* \*

"(H) *Obligating Redevelopers.*— When Project Land is sold or leased by the Local Public Agency, it will obligate the purchasers or lessees, as the case may be, (1) to devote such Project Land to the uses specified in the Project Redevelopment Plan; and (2) to begin and complete the building of their improvements on such Project Land within a reasonable time."

I do not consider it necessary to extend this overlong statement of the facts by referring to another printed brochure captioned "The Gadsden Plan" and shown on its flyleaf to have been "Adopted by The City Planning Commission of The City of Gadsden, Alabama—February 19, 1949." Mr. Wedge testified that the parts of that document upon which the plaintiffs rely were not considered by the Urban Renewal Administration, and Mr. Mills called attention that that document was obsolete:

"I would like for the record to show that is a publication of the City Planning Commission of the City of Gadsden, that the studies were completed in 1947, that it was adopted in January 1949, I think,

prior to the passage of the Housing Act of 1949."

Further, it is not necessary to consider two items of evidence to the introduction of which the defendants objected; namely, a news release of the Housing and Home Finance Agency dated November 7, 1957, and an article from a Jackson, Mississippi, newspaper dated March 5, 1958, describing a meeting at which Mr. Mills described parts of the Gadsden redevelopment program.

Rehearing denied; RIVES, J., dissenting.