**Cady Lauren REISMAN, by her Next Friends, Laurel REISMAN and Ben Reisman, and All Others Similarly Situated, Plaintiffs,**

v.

**The STATE OF TENNESSEE DEPARTMENT OF HUMAN SERVICES; Charles Wilson, Director of Child Welfare Services, Tennessee Department of Human Services, in his official capacity; and Other Unnamed Employees of Tennessee Department of Human Services; and Charles Burson as Attorney General of the State of Tennessee, Defendants.**

No. 90–2756–4BRO.

United States District Court, W.D. Tennessee, W.D.

Oct. 25, 1993.

Hayden Lait, and Connie Westbrook, Memphis, TN, for plaintiff.

Charles W. Burson, Atty. Gen. and Reporter for the State of Tennessee, and Dianne Stamey Dycus, Sr. Counsel, Gen. Civ. Div., Nashville, TN, for defendants.

## FINAL DECISION OF THE COURT

McRAE, Senior District Judge.

When this case was filed in 1990, Ben and Laurel Reisman had been approved as foster parents by the Department of Human Services of the State of Tennessee ("the Department"), and given temporary custody of Baby Jane Doe whose custody had been obtained by the Department and more particularly the Child Welfare Services Division ("CWS") pursuant to statutory and regulatory authority of the state of Tennessee.

At the time that the Reismans were serving as foster parents, they learned that Baby Jane Doe was a "bi-racial" child by virtue of the fact that her father was a black person and her mother was a white person based upon community standards of identifying race.[1]

The Reismans, as foster parents of Baby Jane Doe, observed and otherwise learned of the practices and procedures pertaining to mixed race children by the CWS, particularly in Memphis, Tennessee. The Reismans perceived that the rights and privileges of Baby Jane Doe were being denied; therefore, they undertook to make inquiry of officials of CWS about the lack of consideration of white applicants to adopt Baby Jane Doe. Ben Reisman testified at the hearing in this case that he had four conversations with officials of the Department, including Director Wilson, all of whom said the same thing: Because Baby Jane Doe is a child of mixed heritage that it was the policy of the state of Tennessee to place her in a black family or possibly an interracial family. TR. 1:104. This prompted the Reismans to retain an attorney and file this lawsuit as next friends of Baby Jane Doe and all others similarly situated.

During the pendency of this case, the Reismans elected to apply as adoptive parents of Baby Jane Doe. After they were investigated as potential parents, they were approved

---

1. The lawyers, the Court and the witnesses used the term "bi-racial" and "mixed race" to describe children who are similarly situated to Baby Jane Doe.

and allowed to go forward with an application to adopt Baby Jane Doe. When that status was achieved, the style of this case was changed from "Baby Jane Doe" to "Cady Lauren Reisman" ("Cady").

In the complaint, several civil rights sections of the United States Code are relied upon; however, the Court considers that the controlling section of the Civil Rights Acts alleged is 42 U.S.C. § 1983 which provides in its relevant part as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The privileges and immunities of the citizens relied upon by the next friends in behalf of the plaintiff are set forth in the Fourteenth Amendment to the United States Constitution which provides in part as follows:

No state shall make or enforce any laws which shall abridge the privileges or immunities of citizens of the United States; ... nor deny to any person within its jurisdiction the equal protection of the laws.

A summary of the contentions made in behalf of the plaintiff is set forth on page 2 of the Joint Pretrial Order. In that summary, the next friends contend that race should not be a factor in the placement decision for biracial children or in the alternative, the use of race should be strictly defined and limited as follows: the applicant's ability and willingness to address the child's racial, ethnic, and cultural needs.

The contentions of the Department are set forth also on page 2 of the Joint Pretrial Order. In those contentions, the Department denies that it discriminates against biracial children in placing them for adoption. The Department contends that in the place-ment of a bi-racial child for adoption, the best interests of the child in the particular circumstances are considered. In that placement, the Department uses race as a factor by considering the ability, including life experiences and willingness of the applicant to adequately address the child's racial, ethnical and cultural needs.

Considerable discovery was taken particularly in behalf of the plaintiff, and the attorneys for the respective parties negotiated and resolved many issues by stipulation; however, the parties were unable to agree on the proper policies, practices and procedures to be adopted and followed. Therefore a trial was held at which eighteen witnesses testified, five of whom were qualified as experts by academic accomplishments or experience. Excerpts from the deposition of four other persons were read, and the parties through their respective attorneys stipulated the following facts:

a. The Department uses race as a factor in adoption placement of mixed race children.

b. Under the Department's current policy, race can become the deciding factor, though not the sole factor.

c. Placement of mixed race children with white families has previously been considered by the Department to be a transracial[2] placement and requires approval by the district social services program director's designee.

d. Placement of a mixed race child with black families has previously not been considered a transracial placement by the Department and therefore, does not require the approval of the district social services program director's designee.

e. The Department's policy has, since the filing of this lawsuit, been amended and currently all mixed race children's placements require the approval of the Adoption Program Manager.

f. Both parties agree that it is proper for the Department to consider as a factor an applicant's ability to address the child's racial, ethnic and cultural needs.

---

**2.** The term transracial adoption means the placing of a child with applicants of one race where-

as the child is of a different race.

g.  Mixed race children have been classified by the Department as being of black heritage.

h.  The Department has, since the filing of this lawsuit, proposed to amend its policy to create a separate classification defined as "mixed race children."

i.  A child should be placed as quickly as possible in a loving and nurturing environment.

j.  The Department considers community biases and prejudices in the placement of mixed race children.

k.  At the time of the filing of this lawsuit, there were no Caucasian families in Shelby County on file with the Department who were willing to adopt a mixed race child.

## POLICIES AND PRACTICES OF THE DEPARTMENT

At the outset, it should be noted that the Court finds that CWS and its personnel have been assigned a very difficult task in the determination of how and to whom minors in their custody should be placed for adoption. In addition to the heavy responsibility given to the Department in the placement of any child for adoption in the non-racial situation, a bi-racial child is more difficult to place. The simplest application of the Fourteenth Amendment, namely applying actions of a state in a pure colorblind manner is not always in the best interests of the child. This is based upon the pressures that persons who compose the society place upon a bi-racial person. The record in this case includes testimony from bi-racial persons who were placed for adoption in Caucasian homes.  In both instances, the person adopted was treated with kindness and love and provided for in a comfortable manner. One of the persons, a young female, experienced hostility in school from black persons who apparently resented her being raised by white parents.  She testified that she affiliated with black friends and in their homes learned some black heritage that had not been given to her by her white parents.  She testified that she was bothered by not having

been exposed to black heritage and that she was encountering some frustration about having dated black young persons and more recently had commenced dating a white young person whose parents resented her. However, the testimony was that she had been accepted by the white family and was dating the son without interference.

Dr. Allen O. Battle, a clinical psychologist, testified as an expert on problems that result from persons having racial identity problems.

During his testimony, Dr. Battle was asked the question and gave the answer as follows:

Q.  If you have a person who is going to ignore a bi-racial person and raise that child to solely be white, would that cause a problem?

A.  If the child had marked Negroid features, yes.  If not so, then in my experience, not necessarily so.  After all, what we're dealing with in race is a biological phenomenon, not a cultural one.  And so many people judge the book by its cover, and if the individual has those marked racial features, then they are regarded by the great majority of people as black rather than Caucasian.

TR 2:433–34 [3]

Charles A. Wilson, Director of CWS of the Department, testified at length concerning the policies and the practices of the Department pertaining to adoptions, particularly bi-racial adoptions.

Before testifying about specific factors that CWS applies in adoption placements, he testified that the general purpose for offering adoption services is "to find stable, nurturing and caring permanent homes for children who otherwise do not have them."  He further testified that the ultimate goal in offering these services is for "the children to grow up healthy and to prosper in society."  TR. 1:91

In his testimony, Director Wilson was asked why race is used as a factor in determining a placement for adoption to which he answered:

**3.**  References to the transcript are cited "TR." followed by the volume number of the transcript   and the page.

Well, it's actually one of a number of factors when you take them into account. It's perhaps a combination of getting the ability of the adoptive parents to meet the needs of the child. Race is often an indicator of life experiences and how those life experiences have prepared that parent to confront the unique features and realities of society which a child may encounter.

If a black applicant who has experienced issues of growing up in our society, learning to confront racism, and overcome those barriers and take pride in their background, that is something that would be taken into account, as would other factors with other applicants.

TR. 1:192

In his testimony, Director Wilson also affirmed the preferential practice that has been established by the testimony of other witnesses as well. That practice may be stated as follows:

It is the preference and practice of CWS as a first priority to place a bi-racial child with a bi-racial couple as adoptive parents. If that cannot be done, it is the practice that other things being equal, the child would be placed with a black couple as opposed to a white couple.

TR. 1:208–09

Director Wilson also testified that it was the policy of CWS to consider the heritage of a bi-racial child to be black. TR. 1:199

Furthermore, the preference for a black family over white, all other things being equal, is based upon the belief that the bi-racial child will encounter prejudices as a person of mixed race and that their black parents are in a position to help them respond to that pain and adjust to it. It is the perception of the Department through Director Wilson that typically black Americans have experienced those things day to day throughout their lives and have some advantages of experiences over white Americans who may not have experienced those same confrontations and confusion. TR. 1:211.

On the other hand, when Director Wilson was asked if there were any special efforts on the part of the Department to protect the white heritage of a bi-racial child, he responded as follows:

Well, there are probably special considerations. And I'm sure that an applicant who is other than white, for example, a black applicant or a black couple, is comfortable with the white aspects of the child's background, doesn't try to deny that, would make the child comfortable with that aspect of their background.

The culture itself, there is not as much focus in maintaining and developing aspects of the "white" culture. At least our perception is that in our society, the dominant culture tends to be very strong in terms of our schooling, our media, the education, the entertainment industry. All of those produce a sense of connectiveness with the European development and culture that has been transmitted to this continent. So there are many ways that that already occurs naturally in society.

TR. 1:201

The other mixed race adopted person from Kentucky was a male who at the time of his testimony was 23 years old. He worked in a department store and attended the University of Kentucky as a student. He testified that when he was growing up, he thought of himself as "privileged to be what society calls bi-racial, mulatto, someone who comes from mixed colors." He identified his adoptive parents' race as European and white. His birth parents were a European mother and an African father. TR. 3:548. In his testimony, he emphasized that our society was controlled by the ways of European white persons. In response to a question to tell how he was raised as to what kind of communities and schools, he replied as follows:

I was raised in a community just like this courtroom, a thousand white faces and mine, the only one to speak the truth of the African heritage, to cry out where are the African people in this type of court for the world? That's the way I deal with my reality, not in the past, but in the present.

It's an amazing fight I have. I feel that it's exactly like in this courtroom. Why aren't African people in here? Why can't we stand up?

Why do we have to let white faces decide our future a thousand times and be lost within it?

That you guys can go home to your coffee and you can drive in your cars and drive down European streets.

TR. 3:548

### NON-RACIAL FACTORS THAT AFFECT A CHILD'S BEING PLACED FOR ADOPTION WITH AN APPLICANT OF A WHITE OR BLACK RACE

1. The unavailability of an applicant or applicants of a particular race who have expressed a willingness to apply for a bi-racial child. The record reflects that there are not a large number of persons who have expressed that willingness, and the placement decision needs to be made as soon as possible to get the children out of the temporary foster home.

2. The age of the child to be adopted. This is a factor that needs to be applied for children who have had previous experiences through living in a black or white home whereby they have formed opinions about heritage that should be considered for the best interest of the child and the potential adoptive parents.

3. The health of the child to be adopted. This has reference to children with serious health problems that would require care and expense to complete satisfactory adoption. This would be a strong factor in the decision of the willingness of the applicant.

4. The bonding of the child in a foster home. The record reflects that there is a statutory preference for foster parents to apply for adoption of children who have been in their home as foster children for more than one year. This is premised upon the bonding that is considered important in the early years of children. The availability of foster homes for the placement of children is also a problem for CWS; however, care should be taken in the decision as to the race of the foster parents in view of the statutory preference. The testimony of Sara Dix as approved foster parent for the Department, indicates that she was told in the spring of 1990 in her training to be a foster parent that mixed-race children were considered black and that there were not enough black foster homes to take black infants; therefore they were placed in white foster homes; however, those children would later be moved to black homes because of race. TR. 1:14

5. The desire to preserve sibling relationships. Circumstances call for attempts to be made to have applicants adopt more than one person from a family due to the sibling relationship. This would limit the number of willing and available applicants for multiple adoptions.

### BI-RACIAL CULTURE

There was expert testimony from Dr. Rita Simon, a Ph.D. in sociology who has done a study of parents who had made trans-racial adoptions to see how the children developed. The 204 families consisted of white parents who had adopted at least one non-white child. The study lasted approximately 20 years. She actually did three studies by starting separate interviews of the parents and children in 1971, when the children were between four and seven years old and subsequently tracking the children and parents as much as possible.

Her findings revealed that the children did not have problems with racial identity as a result of their placement in a home of another race. Problems were encountered by the parents and children from other persons by the children being called names at school and elsewhere. TR. 1:32–33. She has concluded in her fourth publication on the study that the "children who were adopted across racial lines grow up healthy, comfortable in both communities." "They are people who understand their own identities and are comfortable with them. They are ... close to their families, to their adoptive parents." TR. 1:39. She also opined that the race of an adoptive parent should not be a factor in the adoption placement. TR. 1:67–8.

The defendants offered the expert testimony of Dr. Ruth Gail Murdock McRoy. She has a bachelor's degree from the University of Kansas, a master's degree in social work from the University of Kansas, and a doctorate in social work from the University of

Texas, where she teaches. She has done research in the area of adoptions. After receiving her master's degree, she served as an adoption worker for the Kansas Children's Service League for whom she set up a program called Black Adoption Services. TR. 2:310–12.

She believes that it is in the best interest of a bi-racial child to be defined as black because she also believes society typically will define a child of "multi-racial parentage as being black." TR. 2:313. She further believes that all other things being equal, a bi-racial child should be placed first with bi-racial adoptive parents. If that is not possible, the child should be placed with a black family. TR. 2:322.

Diana Schumed was a witness offered by the plaintiff. She testified that she and her husband, also Caucasian, had tried unsuccessfully to have children; therefore, she went to the Department office to get information about adoptions. She was told they were only taking applications from Caucasian couples for children over the age of nine, for sibling groups of three or more, or severely handicapped. This prompted her to ask about black or bi-racial infants. "And they [CWS officials] said, no, we don't take applications from Caucasian couples for those kinds of children." TR. 1:163.

The couple went to the Porter Leath Children's Center where they, on two separate occasions, adopted through the Center. Later they had a child of their own. At the time of the trial, their children were a bi-racial girl age seven, a bi-racial girl six, and their own Caucasian daughter seven weeks old. TR. 1:163–64.

In order to accommodate the bi-racial heritage of their two older daughters, they moved from one suburban community in the Memphis, Tennessee vicinity to another one which is more integrated from a residential and public school standpoint. They have also affiliated with a group of interracial families, Mid–South Interracial Interaction. The group gets together for "potlucks" every month.

The defendants offered Mrs. Irma Ann Ault as a witness. She and her Caucasian husband have five adopted children. Four of them are bi-racial, and one had black birth parents. Three were adopted from the Department without any problems. The other two were obtained from other sources. Both of the adoptive parents are nurses and therefore have been able to assist with serious health problems with two of the children. They live in a university neighborhood which is predominantly white and the children are home schooled or in special education situations.

Procedures that are used in a district of the Department in middle Tennessee are designed to have the placement decisions more objective and less susceptible to subjective biases. This testimony was brought out through the witness Deborah Kittrell, who is the District Director for Social Services in a district which consists of 25 counties that surround Davidson County.[4]

Ms. Kittrell explained that in her district, there is a placement committee which is composed of five counselors and one supervisor. Any time a child is ready to be placed for adoption, that committee meets to make the decision. The task is to try to match the applicants with the child. The committee first looks at all the factors of the child, including "education, prior experiences, prior bonding with different kinds of families, sibling attachments." After considering the child, then the pool of applicants is considered in order to match the child with the appropriate applicant. Factors of the applicant to be considered include prior experiences as parents and as children, finances to make sure there are enough to take care of the parents and the child, including unusual medical expenses. TR. 2:397–8.

When Ms. Kittrell was asked if race was a factor, she replied:

> You do in certain cases. It depends on the age of the child. If you have an older child and that child has always been with a certain race family, then that would be what you would be looking for because that

4. Davidson County is a metropolitan municipality which includes the City of Nashville, the capital of Tennessee. Therefore, surrounding counties are primarily suburban or rural.

would be one of those experiences that would be important to the child later on. So you have to look at race. But again, it's one of those factors that depends on the other factors as to how important that would be.

TR. 2:398

When Ms. Kittrell was asked her understanding of the Department's policy in placing bi-racial children for adoption, she testified that it was her understanding that those placements would be handled like any others, namely matching the child with the applicant.

Ms. Kittrell also testified that the mixture afforded by the membership of the Placement Committee diluted the influence of subjectivity based on the workers' prior experiences. She further testified that one of the reasons they went to the placement committee concept was to limit the application of personal biases or prejudices of individual workers. TR. 2:400. Other efforts to limit the personal bias of workers in her district includes continuous training from experienced supervisors and having the Placement Committee include members of different races and backgrounds. TR. 2:401.

## CONCLUSIONS OF LAW

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws." The core purpose of this clause of the Constitution is to prohibit governmentally imposed purposeful discrimination while acting under the color of law of a state of the United States. *Strauder v. West Virginia*, 100 U.S. 303, 307–308, 25 L.Ed. 664 (1880); *Palmore v. Sidoti*, 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984).

■ This case is unique because it involves the rights of children whose biological parents were of different races and who have come into the custody of the state of Tennessee through the Department where under the laws of Tennessee, they are candidates for adoption. Therefore, the members of the class involved in this equal protection case are entitled to claim the rights guaranteed by the Constitution of both the white and black races for equal protection.

The issues in this case more particularly concern the practices and procedures of the Department in attempting to place bi-racial children in furtherance of the best interests of the children. The *Palmore* case, *supra*, is a Supreme Court of the United States case in which the best interests of a minor child were considered in a child custody determination which arose in the appropriate domestic relations court in the state of Florida. In that case, the petitioner was Linda Sidoti Palmore who had been married to the respondent, Anthony J. Sidoti. Both were Caucasians and were divorced in Florida when the mother was awarded custody of the three-year-old daughter. Within a year from the time of the divorce, the father sought custody of the child based upon a change of conditions, namely that the petitioner was cohabiting with a Negro, Clarence Palmore, whom she married two months after the initiation of the petition to modify.

The trial court noted the case as one involving the social consequences of an interracial marriage. The Court then noted that the counselor recommended a change of custody because "the wife has chosen for herself and for her child a lifestyle unacceptable to the father *and to society* .... The child ... at school age will be subject to environmental pressures not of choice."

Chief Justice Berger delivered the opinion for a unanimous court in which he wrote as follows:

A core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race.... Classifying persons according to their race is more likely to reflect racial prejudice than legitimate public concerns. The race, not the person, dictates the category. 466 U.S. at 432, 104 S.Ct. at 1881

\* \* \* \* \* \*

The goal of granting custody based on the best interest of the child is indisputably a substantial governmental interest for the purposes of the Equal Protection Clause. 466 U.S. at 433, 104 S.Ct. at 1882

\* \* \* \* \* \*

The question, however, is whether the reality of private biases and the possible injury they might inflict are permissible considerations for removal of an infant child from the custody of its natural mother. We have little difficulty concluding that they are not. The Constitution cannot control such prejudices but neither can it tolerate them. *Ibid.*

In the instant case, the officials of the Department have followed the practice of considering the ability and willingness of the applicants for adoption to address the child's separate black and white racial, ethnic and cultural needs. As indicated in the findings, the Department considers that the heritage of the bi-racial child is black. Therefore in a situation where there are no bi-racial couples as applicants for the child and other things being equal, the child will be placed in a black family based upon the belief that black persons have experienced the type of prejudice that the bi-racial child will encounter and will be better equipped to train the child to accept his black heritage. It is the position of the Department that the child should also be made aware of the white heritage that he or she has; however, the white heritage is obtained from the dominant position that the white race has in our society, where the child learns of his or her white heritage in school, through the media, the entertainment industry and other similar sources.

The many facets of the final decision make the adoption placement decision a subjective one. Not the least of which is the decision as to when the numerous facts in a given case meet the criteria of "other things being equal." Similarly, the subjective interpretations and applications of the "needs" of the child which are modified by "racial," "ethnic" and "cultural" are subject to very different interpretations, particularly when all three of those modifying words are wrapped in a blanket of "heritage."

The most applicable definitions of those words set forth in Webster's International Dictionary 2d.Ed. are as follows:

**HERITAGE**—the lot, condition or status into which one is born.

**CULTURE**—the complex of distinctive attainments, beliefs, traditions, etc. constitut-

ing the background of a racial, religious or social group; as a nation with many *cultures.*

**ETHNIC**—relating to community of physical and mental traits in races or designating groups of races of mankind discriminated on the basis of common customs and characters.

**RACIAL**—of, pertaining to or characteristic of a race or family of persons.

**RACIALISM**—racial characteristics, tendencies, prejudices, specifically race hatred.

■ This Court concludes that the practice and procedure whereby the Department officials assign a black heritage to a bi-racial child and place the child for adoption in a black home instead of a white home, so that the child may learn his or her heritage from the black family who has undoubtedly encountered discrimination, while relying upon schools, the media, recreation and other similar sources to explain the white part of the heritage of the bi-racial child, violate the equal protection rights of the bi-racial children in the class involved in this case.

This Court is of the opinion that the goals of the adoptive parents should be to provide the love and nurturing to help overcome the hurt that society might impose upon a bi-racial person. The Department, the adoptive parents and the adopted children should be trained to prepare for meeting their bi-racial and bi-cultural needs including the heritage of a bi-racial person at the time of the child's adoption.

The case of *Read Edmonson v. Leesville Concrete Company, Inc.,* 500 U.S. 614, ——, 111 S.Ct. 2077, 2088, 114 L.Ed.2d 660, 680 (1991) is a case in which the Supreme Court considered whether the race discrimination in exercising preemptory jury challenges in criminal cases which was prohibited in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), should also be prohibited in civil cases. Although the race discrimination considered in those cases was different from the type of discrimination referred to herein, both cases involve the Equal Protection Clause of the Fourteenth Amendment, and the dicta set forth in *Read Ed-*

*monson* case is equally appropriate to the instant case:

> If our society is to continue to progress as a multi-racial democracy, it must recognize that the automatic invocation of race stereotypes retards that progress and causes continued hurt and injury.

In this twentieth century, our society has seen tremendous changes in the lives of our citizens pertaining to the elimination of racial discrimination in all phases of the society. This has come about through interpretations of the federal and state constitutions, federal and state legislation and regulations and executive orders both federal and state. These changes brought racial equality in the public sponsored education programs between kindergarten and graduate studies, in the work place, in public accommodations. In the *Palmore* case, *supra*, the Court not only overturned a child custody decision based upon a divorced father and society's objection to a bi-racial marriage, but also the Court noted that as early as 1917 in the case of *Buchanan v. Warley*, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917), the Court invalidated a Kentucky law forbidding Negroes from buying homes in white neighborhoods as a violation of the Equal Protection Clause.

In the more closely analogous situations, a state statute or policy that every child having mixed black and white parentage could not be adopted by a white family was declared unconstitutional in *Drummond v. Children's Services*, 547 F.2d 835 (5th Cir.1977). A similar statute prohibiting any interracial adoption was declared unconstitutional in *Compos v. McKeithen*, 341 F.Supp. 264 (D.C.La.1971).

This Court, therefore, concludes that bi-racial children in the custody of the Department shall be classified as bi-racial children with a bi-racial culture and a bi-racial heritage. The Court further concludes that the bi-racial children shall be placed in foster homes and in adoptive homes with bi-racial families, if possible. If not, they shall be placed in the most suitable home based upon the availability and suitability of the adoptive parents or parent with a goal of providing for the children appropriate love and nurture with a commitment to assist the children in solving as much as possible problems created by members of society in either the black or white race or both.

Because of the myriad differing circumstances which must be considered to determine the best interests of a child for adoption and further because the consideration of those factors which determine the proper placement, the Court concludes that all placements of bi-racial children in the division in this judicial district shall be made by a Placement Committee instead of an approval of one person as is the current and past practice of the Department. The Placement Committee shall be diverse in its membership as to race and other recognized classifications such as gender. While the Court does not order that the Placement Committee be patterned after the one used in the division consisting of counties around Davidson, the Placement Committee in that division appears to have some practices which minimize the subjectivity of the decision.

### *RELIEF*

At the end of the eighteen pages of Defendants' Proposed Findings of Fact, the attorneys for the defendants made the following statement:

> While the defendants respectfully submit that the plaintiffs did not carry their burden of proof and expressly do not waive the right to appeal any adverse ruling, the defendants would propose the following relief in the event that the Court rules in favor of the plaintiffs:

Following the statement set forth above, there are nine pages of twelve numbered topics which set forth what the Department intends to do. This includes some specific procedures and practices which represent changes in their former practices. The Court is of the opinion that there are some helpful items in there and there are some statement of present policies that were not brought out during the trial. Some of the provisions seem to continue the use of non-defined terms such as racial heritage, mixed racial heritage. The Court concludes that while this offering may be helpful for correcting some of the wrongs which the trial has

brought out, the Court is unwilling to undertake to adopt, reject or change these provisions. In the first place, the Court has made it known from the very beginning that the Court does not consider itself trained and qualified to prescribe in detail the proper method of determining how bi-racial children should be placed for adoption. This Court is undertaking to interpret the Constitution of the United States in the light of the facts that have been presented in the trial of this case. The field of expertise that is required for trained social workers to solve the difficult problems of the adoption of bi-racial children is not included in the task assigned to the Court under the Rules of Civil Procedure and the applicable statutes pertaining to the jurisdiction of federal courts.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

(1) that a declaratory judgment in favor of the plaintiff Cady Lauren Reisman by next friends Laurel Reisman and Ben Reisman and all others similarly situated, be entered declaring that the practice and procedures of the defendants violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution in the manner and to the extent set forth in the Final Decision of the Court, and the plaintiff and all others similarly situated are entitled to injunctive relief pursuant to 42 U.S.C. § 1983;

(2) that the defendants State of Tennessee Department of Human Services, Charles Wilson, Director of Child Welfare Services, Tennessee Department of Human Services, in his official capacity, and other unnamed employees of Tennessee Department of Human Services are hereby enjoined from (1) classifying bi-racial children as having either a black or white heritage and placing the child or children in the home of black or white adoptive parents in preference to the opposite race in order to satisfy the needs of the child's black or white separate racial heritage or culture or to predict and thereby avoid the problem-causing conduct of black or white members of society who might ridicule or complain about the bi-racial adoption; (2) the defendant Wilson is hereby mandatorily enjoined to cause to be adopted for the appropriate divisions of the Department such policies and practices whereby bi-racial children who are in custody of the Department shall be placed in foster homes and subsequently placed for adoption as bi-racial children to be treated as persons to be loved and nurtured as having a bi-racial culture and bi-racial heritage, said policies shall be fully incorporated in all training for Department officials, prospective foster parents and adoptive parents; (3) defendant Wilson is also mandatorily enjoined to cause to be appointed a Placement Committee for adoptions in the division of the Department which includes Shelby County, Tennessee. This Committee shall determine the proper placement for adoption of all bi-racial children. The Committee shall consist of not more than five persons plus two alternates to cover vacancies when members cannot attend. It shall act upon the agreement of not less than three members. Its charge will be to meet and discuss the proposed applicants for adoption to the end that a decision may be made by not less than three members. The charge shall include minimizing subjectivity of the respective members or the counselor working up the application, particularly to avoid preferences based upon race.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the attorneys for plaintiff shall be awarded attorneys' fees in accordance with 42 U.S.C. § 1988 and its interpretive authorities.

The attorneys for the plaintiff shall prepare and submit to opposing counsel a proposed form of declaratory judgment including the proposed form of injunctions, it being the intention of the Court to have the attorneys for both sets of parties to have an opportunity to consider the wording and scope the Court has chosen for the judgment including the injunctive relief. An application for attorneys' fees may be submitted after the declaratory judgment has been submitted and approved.